UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CITY OF PONTIAC, MICHIGAN,

      Counter-Plaintiff,

v.

RUBICON REAL ESTATE
HOLDINGS, LLC and JOSEPH
BROWN,

      Counter-Defendants.

Case No. 23-cv-10439

Hon. Paul D. Borman
Mag. Judge Curtis Ivy, Jr.

---

## <u>COUNTERCLAIM</u>

Counter-Plaintiff City of Pontiac, Michigan ("Pontiac"), hereby brings the following Counterclaim against Counter-Defendants Rubicon Real Estate Holdings, LLC ("Rubicon") and Joseph Brown ("Brown") (together, "Counter-Defendants"). In support of its Counterclaim, Pontiac states as follows:

1.    This is a civil action under the Racketeer Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. § 1961, *et seq.* stemming from, among other unlawful actions, Rubicon's participation in a scheme and conspiracy to bribe public officials.

2.    As further detailed below, Counter-Defendants enabled, perpetuated, and participated in an illegal enterprise and pattern of racketeering activity designed to: (A) further Rubicon's own illicit business interests; and (B) further former public

officials' illicit personal interests, including those of former Pontiac employee Dwayne Lyons ("Lyons") and another former Pontiac public official hereinafter referred to as "Public Official No. 1".

## Parties, Jurisdiction, and Venue

3.      Rubicon is a Michigan limited liability company, with its principal place of business in Oakland County, Michigan.

4.      Upon information and belief, Brown is an individual residing in Oakland County, Michigan.

5.      Pontiac is a Michigan municipal corporation located in Oakland County, Michigan.

6.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1964 because the dispute in this case involves a civil action arising under federal law.

7.      This Court has personal jurisdiction over Pontiac and Rubicon because both parties reside within and/or conduct business within the Eastern District of Michigan.

8.      Venue is proper under 28 U.S.C. § 1391 and 18 U.S.C. § 1965 because Rubicon resides within—and therefore is subject to personal jurisdiction—within the Eastern District of Michigan.

9.      The allegations under this counterclaim arise out of (or otherwise relate to) the transaction or occurrence that is the subject matter of Rubicon's complaint in Case No. 23-cv-10439. The claims under this counterclaim further do not require the addition of any new or additional parties over whom the Court cannot acquire jurisdiction. Therefore, the claims are properly brought pursuant to Fed. R. Civ. P. 13(a)-(b).

### General Allegations

10.      Rubicon is a commercial real estate company engaged in (among other business activities) the purchase, acquisition, and development of commercial real estate.

11.      At all relevant times alleged in this counterclaim, Brown was an acting member of Rubicon.

12.      DA Contracting is a Michigan limited liability company with its principal place of business in Oakland County, Michigan.

13.      Rubicon and DA Contracting are known business associates. Particularly, DA Contracting has performed demolition and other corresponding services on properties owned by Rubicon. Moreover, the owner of DA Contracting, Bradley Klintworth ("Klintworth"), is also a member of Rubicon.

14.      Upon information and belief, at all relevant times alleged in this counterclaim, an individual named Vladimir Abu Ali ("Abu Ali") was DA

Contracting's Vice President and Controller and a member thereof.

15.    Public Official No. 1 was elected in or about 2014 and held public office until approximately August 3, 2021.

16.    At all relevant times alleged in this counterclaim, Lyons was a (now-former) employee of Pontiac and worked with and/or alongside now-former Public Official No. 1.

17.    Upon information and belief, Public Official No. 1 hired Lyons without Pontiac's Human Resources Department's knowledge, awareness, input, or participation in any formal interview process. Rather, Pontiac's Human Resources Department was only first aware of Lyons' hiring after Public Official No. 1 instructed the Pontiac Human Resources Department to complete a conditional offer letter.

18.    Upon information and belief, during Lyons tenure as an employee for Pontiac, Public Official No. 1 simultaneously paid Lyons out of her campaign account for work performed for or on behalf of Pontiac.

19.    Lyons is the creator and, upon information and belief, sole member of a Michigan limited liability company called Innovative Community Elevations, LLC (hereinafter, "Innovative Community Elevations").

20.    In or about March 29, 2019, Rubicon entered into a Real Estate Purchase Agreement (the "Purchase Agreement") for property located within the

4

City of Pontiac (*i.e.*, the "Subject Property"). **Exhibit A**. Under the terms of this Purchase Agreement, Rubicon agreed to undertake good faith efforts to submit plans and applications to Pontiac for marihuana licensing. *See id.* at ¶ 10.

21.     Sometime after entering the Purchase Agreement, Rubicon hired DA Contracting as a demolition contractor for the Subject Property.

22.     At the time Rubicon entered the Purchase Agreement, the Subject Property was zoned as a C-1 Local Business. However, Pontiac's C-1 Local Business zoning does not permit the operation of marihuana businesses or facilities.

23.     Accordingly, to permit this marihuana licensing for the Subject Property, Rubicon soon thereafter petitioned Pontiac's City Planning Commission for a zoning map amendment.

24.     At the time of Rubicon's petition for a zoning map amendment, Public Official No. 1 sat on the Pontiac City Planning Commission.

25.     Upon information and belief, Public Official No. 1, Lyons, and Brown held several in-person meetings at or about this time, including one attended by Public Official No. 1 and Brown at the Townsend Hotel in Birmingham, Michigan.

26.     At or pursuant to these meetings, following Rubicon's request for a zoning map amendment, Brown and/or Rubicon agreed to pay Public Official No. 1 and/or Lyons $5,000.00 for placement of the zoning petition on the City Planning Commission agenda.

5

27.     On December 18, 2019, the Pontiac City Planning Commission held a public hearing in which Rubicon's request for a zoning map amendment was placed on the agenda.

28.     Ultimately, Rubicon's request was granted, and the Pontiac City Planning Commission (with Public Official No. 1 present) recommended that City Council change the Subject Property from a C-1 Local Business zoning to a C-3 Corridor Commercial and an M-1 Light Manufacturing zoning.

29.     Following the City Planning Commission's recommendation, the Pontiac City Council convened and approved Resolution 20-29 on January 21, 2020, thereby adopting Rubicon's requested Zoning Map amendments. These zoning amendments were memorialized in a rezoning agreement between Rubicon and the City on or about January 21, 2020. *See* **Exhibit B**.

30.     Shortly thereafter, on February 6, 2020, Lyons (through his company Innovative Community Elevations) sent a "consulting" invoice to Rubicon and/or Brown in the amount of $5,000.00. Lyons was actively employed by Pontiac at this time.

31.     On or about February 27, 2020, Rubicon closed on the purchase of the Subject Property.

32.     Subsequently, on March 6, 2020, Abu Ali (DA Contracting's Vice President and Controller) signed and sent a $5,000.00 check to Innovative

Community Elevations.

33. On March 9, 2020, Lyons filed articles of organization for Innovative Community Elevations. *See* **Exhibit C**.

34. One day later, on March 10, 2020, Lyons signed and deposited the $5,000.00 check on behalf of Innovative Community Elevations.

35. At the time that Lyons received, signed, and deposited the $5,000.00 check from DA Contracting, Brown and Klintworth were co-members of Rubicon. Furthermore, at this same time, Klintworth was the owner of DA Contracting.

36. Upon information and belief, Rubicon never directly responded to Innovative Community Elevations' $5,000.00 debt owed under the February 6, 2020 "consulting" invoice, nor did Innovative Community Elevations ever demand further payment or collections from Rubicon.

37. Subsequently, on April 13, 2021, Public Official No. 1 filed an Affidavit of Identity with the Pontiac City Clerk pertaining to his or her reelection campaign.

38. As included on the Affidavit of Identity, Public Official No. 1 averred that:

> *all statements, reports, late filing fees, and fines due from me or any Candidate Committee organized to support my election to office . . . have been filed or paid.* I acknowledge that making a false statement in this affidavit is perjury – a felony punishable by a fine up to $1,000.00 or Imprisonment for up to 5 years, or both . . . .

18836\462986\270976089

(emphasis in original).

39.     Among the reports and/or statements referenced in the Affidavit of Identity were campaign finance disclosure statements—all of which were required under the Michigan Campaign Finance Act, MCL 169.201 *et seq.* Accordingly, Public Official No. 1's averment contemplates that these campaign finance disclosure statements were filed as required by law.

40.     However, as later determined by the Pontiac City Clerk, Public Official No. 1 and his or her campaign failed to file numerous campaign financing reports, including: (1) a 2020 annual report; (2) a 2020 October quarterly report; (3) a 2020 July quarterly report; (4) a 2019 annual report; (5) a 2019 October quarterly report; and (6) a 2019 July quarterly report.

41.     Accordingly, at the time of making his or her Affidavit of Identity, Public Official No. 1's representations thereunder were false and perjured.

42.     Upon information and belief, Public Official No. 1's failure to file the aforementioned campaign finance statements—and therefore his or her falsification of the subsequent Affidavit of Identity—are a direct and proximate result of Public Official No. 1's demand and/or acceptance of bribe payments, including but not limited to any bribe payments made by Rubicon.

43.     It is reasonably foreseeable that Rubicon's bribe payments to Public Official No. 1 and/or Lyons would lead to the failure to file campaign financing

8

reports, falsified affidavits, and/or other campaign financing violations.

44.     Separately, on or about December 27, 2021, Lyons filed a Request for Leave form that was signed by both Lyons and Public Official No. 1. At the time Lyons filed this Request for Leave form, he knew that the dates contained therein were inaccurate, and therefore were knowingly made in violation of city policy.

45.     On or about this time, Lyons was in possession of several electronic devices used by him and former-mayor Public Official No. 1 during the course of their public employment, including cell phones and/or laptops owned by Pontiac and other cell phone(s) and/or laptop(s) personally owned by Lyons.

46.     Upon information and belief, Lyons' December 2021 Request for Leave, *supra*, was taken to destroy and/or delete the information and data on the aforementioned electronic devices.

47.     Specifically, on January 8, 2022, an employee of the Pontiac Housing Commission ("Public Official No. 2") instructed Pontiac that Public Official No. 1 and/or Lyons received bribe payments from Rubicon as a condition of placing its zoning request on the City Planning Commission's agenda.

48.     Following receipt of Public Official No. 2's message, Lyons was instructed to come to City Hall and return the electronic devices used by him and Public Official No. 1. Upon receiving the electronic devices, Pontiac determined that

Lyons destroyed and/or deleted information and data on these electronic devices prior to returning them.

49.     Similarly, upon information and belief, Public Official No. 1 also improperly removed numerous physical documents belonging to Pontiac following his or her tenure, including but not limited to loading a truck with physical documents on or about his or her last day of public employment.

50.     It is reasonably foreseeable that Counter-Defendants' bribe payments to Public Official No. 1 and/or Lyons would lead to the destruction or removal of electronic data, information, and/or documents that evidence illegal activity (including but not limited to Counter-Defendants' bribe payments).

51.     Upon returning these electronic devices to Pontiac, Lyons was placed on unpaid administrative leave effective immediately.

52.     On March 25, 2022, Pontiac conducted an internal investigation that included an interview of Lyons. In this interview, Lyons admitted that he never performed any work on behalf of Rubicon, despite sending an invoice for "consulting" services.

53.     Pontiac's internal investigation resulted in Lyons' termination.

54.     Counter-Defendants are capable of holding a legal or beneficial interest in property, and therefore are "persons" as defined by 18 U.S.C. § 1961(3).

18836\462986\270976089

55.     Counter-Defendants, together with Public Official No. 1, Lyons, and DA Contracting, have utilized a public office and/or the Pontiac City Planning Commission to perpetuate an illegal enterprise and bribery scheme in furtherance of their own illegitimate pecuniary and/or personal interests (hereinafter, the "Enterprise").

56.     Counter-Defendants, together with Public Official No. 1, Lyons, and DA Contracting, are individuals and/or legal entities associated in fact through their improper use of Pontiac public office and/or the Pontiac City Planning Commission to promulgate, advance, and enable an illegal enterprise and bribery scheme, and therefore form an "enterprise" as defined by 18 U.S.C. § 1961(4).

57.     In perpetuating an illegal bribery scheme and conspiracy to falsify campaign finance statements and/or destroy electronic data, the Enterprise has affected interstate commerce.

58.     The Enterprise's actions as detailed herein constitute: (1) acts of bribery, particularly in the form of *quid pro quo* payment to place Rubicon's zoning amendment request on the City Planning Commission's agenda (18 U.S.C. § 201); (2) wire fraud and/or mail fraud, particularly in the form of payment, receipt, and deposit of bribery payments (18 U.S.C. §§ 1341, 1343); (3) fraud and related activity in connection with identification documents, particularly in the form of Public Official No. 1's falsified Affidavit of Identity (18 U.S.C. § 1028); (4) obstruction of

11

justice and/or obstruction of criminal investigations, particularly in the form of removed or deleted information, data, and/or documents (18 U.S.C. § 1510); (5) racketeering and the aid of racketeering enterprises (18 U.S.C. § 1952); and (6) overt acts in furtherance of the foregoing bribery scheme and conspiracy, all of which were designed to advance the Enterprise's pecuniary interests through illegal activity.

59.     As a direct and proximate consequence of Counter-Defendants' actions, Pontiac has sustained monetary and non-compensable injuries, including but not limited to violations of the public trust and goodwill, defense costs of pending lawsuits, and defense costs of claims advanced by Rubicon against Pontiac (along with related costs and fees), and other related costs and damages stemming from Counter-Defendants' actions.

### COUNT I – VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ("RICO") ACT, 18 U.S.C. § 1962(c)

60.     Pontiac incorporates by reference each and every allegation set forth above.

61.     18 U.S.C. § 1962(c) states that:

> [I]t shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity.

62.     Counter-Defendants are "persons" within the meaning of 18 U.S.C. § 1961(3).

63.     Counter-Defendants, as part of the Enterprise, collaborated as an ongoing organization and functioned as a continuing unit (*i.e.*, an "enterprise," as defined under 18 U.S.C. § 1961(4)), for the purpose of perpetuating and concealing the fraudulent scheme described herein.

64.     Counter-Defendants are employed by and/or are associated with the Enterprise and conducted and participated in the operation and management of the Enterprise.

65.     In furtherance of their scheme and the Enterprise, Counter-Defendants used the mails and wires occurring in interstate commerce, including but not limited the payment, receipt, and deposit of bribery payments—all of which affected interstate commerce.

66.     In furtherance of their scheme and the Enterprise, Counter-Defendants further committed, furthered, or otherwise contributed to foreseeable acts of racketeering activity as defined under 18 U.S.C. § 1961(1). Particularly, those predicate acts of "racketeering activity" came in the form of, *inter alia*, multiple acts of: (1) bribery (18 U.S.C. § 201); (2) wire fraud and/or mail fraud, particularly in the payment, receipt, and deposit of bribery payments (18 U.S.C. §§ 1341, 1343); (3) fraud and related activity in connection with identification documents (18 U.S.C.

§ 1028); (4) obstruction of justice and/or obstruction of criminal investigations (18 U.S.C. § 1510); (5) racketeering and the aid of racketeering enterprises (18 U.S.C. § 1952); and (6) overt acts in furtherance of the foregoing bribery scheme and conspiracy.

67.    By way of example, Counter-Defendants committed, furthered, or otherwise contributed to a pattern of racketeering activity through the Enterprise by: (1) paying, collecting, and depositing illicit bribe payments to Lyons and/or Public Official No. 1 as a *quid pro quo* transaction to place Rubicon's zoning amendment request on the City Planning Commission's agenda (18 U.S.C. §§ 201, 1341, 1343, 1952); (2) proximately causing Public Official No. 1's false and perjured Affidavit of Identity, which failed to include and/or disclose campaign financing statements as required by law (18 U.S.C. § 1028); and (3) proximately causing Lyons to destroy and delete electronic information and data evidencing these illegal activities. (18 U.S.C. § 1952).

68.    The foregoing predicate acts committed by Counter-Defendants occurred within ten (10) years of one another and constitute a pattern of racketeering activity under 18 U.S.C. § 1961(5).

69.    The pattern of racketeering activity used by Counter-Defendants to commit the predicate acts described herein have caused damage to Pontiac and others, including the general public.

14

70.     As a direct and proximate result of Counter-Defendants' commission of those predicate acts and participation in that pattern of racketeering activity, Pontiac has suffered substantial monetary and non-compensatory damages.

71.     By reason of Counter-Defendants' violations of 18 U.S.C. § 1962(c), Pontiac is entitled to treble damages it sustained plus reasonable attorneys' fees and costs pursuant to 18 U.S.C. § 1964(c).

## COUNT II – VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ("RICO") ACT, 18 U.S.C. § 1962(d)

72.     Pontiac incorporates by reference each and every allegation set forth above.

73.     As set forth above, Counter-Defendants agreed and conspired to violate 18 U.S.C. § 1962(c). Specifically, Rubicon conspired to conduct and participate in the conduct of the affairs of the Enterprise through a pattern of racketeering activity under 18 U.S.C. § 1962(c), including but not limited to meeting with Lyons and/or Public Official No. 1 to coordinate and effectuate an illegal bribery scheme.

74.     Counter-Defendants intentionally conspired and agreed to conduct and participate in the conduct of the Enterprise through a pattern of racketeering activity and agreed to—or otherwise condoned or encouraged the reasonably foreseeable commission of—those acts to further the schemes described herein.

75.     Counter-Defendants' fraudulent scheme manifested a knowing and voluntary agreement by Counter-Defendants and the Enterprise to participate in a

racketeering enterprise through the commission of two or more predicate acts of racketeering activity in violation of 18 U.S.C. § 1962(d).

76.    The pattern of racketeering activity used by Counter-Defendants to commit the predicate acts described herein have caused damage to Pontiac and others, including the general public.

77.    As a direct and proximate result of Counter-Defendants' commission of those predicate acts and participation in that pattern of racketeering activity, Pontiac has suffered substantial monetary and non-compensatory damages.

78.    By reason of Counter-Defendants' violations of 18 U.S.C. § 1962(d), Pontiac is entitled to treble damages it sustained plus reasonable attorneys' fees and costs pursuant to 18 U.S.C. § 1964(c).

WHEREFORE, Counter-Plaintiff City of Pontiac respectfully requests that this Court:

A.    Enter judgment in favor of Pontiac and against Counter-Defendants;

B.    Enter judgment for Pontiac and against Counter-Defendants for all actual, consequential, and treble damages stemming from Counter-Defendants' unlawful conduct, including but not limited to any interest and/or costs;

C.    Enter judgment for Pontiac and against Counter-Defendants granting any and all equitable relief as may be appropriate, including but not

limited to: (1) a divestment of any gains and/or interest in the Enterprise and/or (2) imposing reasonable restrictions on Counter-Defendants' ability from engaging in the conduct detailed herein;

D.    Enter judgment awarding Pontiac all reasonable attorneys' fees; and

E.    Order any such other relief that this Court deems just and proper.

Respectfully Submitted,

Date: June 2, 2023

/s/ Chuck Murphy
CLARK HILL PLC
Charles Murphy (P28909)
*Attorneys for Defendants*
151 S. Old Woodward Ave., Ste. 200
Birmingham, MI  48009
(248) 988-5879
cmurphy@clarkhill.com

17

## JURY TRIAL DEMAND

Counter-Plaintiff City of Pontiac hereby demands a trial by jury on all claims.

Respectfully Submitted,

Date: June 2, 2023

/s/ Chuck Murphy

CLARK HILL PLC
Charles Murphy (P28909)
*Attorneys for Defendants*
151 S. Old Woodward Ave., Ste. 200
Birmingham, MI  48009
(248) 988-5879
cmurphy@clarkhill.com

18

Exhibit A

## AGREEMENT FOR PURCHASE AND
## SALE OF COMMERCIAL REAL ESTATE

THIS AGREEMENT FOR PURCHASE AND SALE OF COMMERCIAL REAL ESTATE (the "Agreement") is made and entered into this 27th day of March, 2019 ("Effective Date"), by and between The Point Investment, LLC ("Seller") and Rubicon Real Estate Holdings, LLC ("Purchaser").

WHEREAS, Seller is the owner of certain real property located in the City of Pontiac, Oakland County, Michigan, commonly known as 1-97 South Glenwood, Pontiac, Michigan 48342 and legally describe on Exhibit A attached hereto and incorporated herein by this reference (the "Property").

WHEREAS, Seller desires to sell, and Purchaser desires to purchase, the real property and improvements located thereon as hereinafter more particularly described, upon the terms and conditions set forth herein;

NOW, THEREFORE, in consideration of the mutual covenants and undertakings set forth below and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, including payment of the purchase price in consideration for conveyance of the premises as described below, the parties hereby agree as follows:

1. Sale and Purchase of Premises

Seller hereby agrees to sell and convey to Purchaser, and Purchaser hereby agrees to purchase and take from Seller, that certain parcel of real estate located in Oakland County, Michigan, commonly known as 1-97 South Glenwood, Pontiac, Michigan 48342, together with all improvements and fixtures located thereon, together with all easements, appurtenances, passages, mineral and water rights and other rights, liberties, and privileges in any way appertaining to any of the foregoing, including all rights of Seller, if any, to any land lying in the bed of any street or other public way adjacent to the property, and in and to any strips, gaps, or gores adjoining the property on all sides thereof (all of the foregoing, including the property, being collectively referred to herein as the "Premises" or "Property").

2. Purchase Price and Payment Thereof

The purchase price ("Purchase Price") for all of Seller's right, title and interest in and to the Premises shall be $5,000,000.00. The Purchase Price will be payable by Purchaser to Seller, subject to a credit in the amount of the Initial Deposit pursuant to Section 4 and other adjustments pursuant to Section 5 as provided herein, shall be paid by Purchaser to Seller on the Closing Date by wired federal funds immediately available to Seller's designated bank from the Escrow Agent, as provided for at Closing.

3. Closing

Subject to the satisfaction of all terms and conditions of this Agreement, the Closing of the sale and purchase of the Premises shall occur on or before June 20, 2019 (the "Closing") unless such closing is extended pursuant to Section 5. Closing shall take place at Title Connect, LLC, attention Jeff Gunsberg (the " Escrow Agent"), 28470 W. 13 Mile Road, Suite 325, Farmington Hills, MI 48334 At and as of Closing, subject to the contemporaneous performance by Purchaser of its obligations set forth below, Seller shall:

A. Convey the property to Purchaser by deed of general warranty in a form acceptable to Purchaser, free and clear of all liens and encumbrances except (i) those which are acceptable to Purchaser

and as any title company will insure and (ii) governmental laws and regulations (including zoning regulations) affecting the property.

B. Deliver possession of the Premises at and as of the time of recording the deed.

C. At and as of the Closing, subject to the contemporaneous performance by Seller of its obligations set forth above, Purchaser shall deliver to Escrow Agent the purchase price, in the manner set forth in Section 2.

4. Initial Deposit

As evidence of good faith, within 3 business days of Seller signing this Agreement, Purchaser will deliver the sum of $100,000 by Wire Transfer to the escrow agent (the "Initial Deposit"):

A. The Initial Deposit shall be applied to the Purchase Price at the time of Closing; and

B. The Initial Deposit is non-refundable.

5. Options to Extend

In the event that Closing does not occur on or before June 27, 2019, Purchaser shall have the option to extend this Agreement as set forth below by paying Seller an additional non-refundable payment(s) (the "Option Payments"):

| Option no. | Payment Date | New Closing Date | Additional Option Payment |
|---|---|---|---|
| Option 1 | June 27, 2019 | July 27, 2019 | $25,000.00 |
| Option 2 | July 27, 2019 | August 27, 2019 | $25,000.00 |
| Option 3 | August 27, 2019 | September 27, 2019 | $25,000.00 |
| Option 4 | September 27, 2019 | October 27, 2019 | $25,000.00 |
| Option 5 | October 27, 2017 | November 27, 2019 | $50,000.00 |
| Option 6 | November 27, 2019 | December 27, 2019 | $50,000.00 |
| Option 7 | December 27, 2019 | January 27, 2020 | $100,000.00 |
| Option 8 | January 27, 2020 | February 27, 2020 | $100,000.00 |

Each Option Payment by Purchaser shall be applied to the Purchase Price at Closing. In order to exercise an option, Purchaser must notify the Seller in writing Five (5) days prior to the expiration of the applicable extension. Purchaser shall be required to transfer by wire the additional option payment on the applicable payment date. The failure to transfer the monies on the applicable payment date will result in a late fee payment of $5,000 on each incident. The additional Option Payments, once exercised, are non-refundable.

6. Apportionments; Responsibility for Other Expenses

A. Real Estate Taxes and Assessments

All taxes and assessments (including special assessments) affecting the Property for any time period prior to the date of closing shall be paid by Seller, notwithstanding the fact that such taxes or assessments have become a lien upon or assessed against the Property as a result of any law. Current Taxes (as hereinafter defined), if any, shall be prorated and adjusted as of the date of Closing in accordance with the due date basis of the municipality or taxing unit in which the Property is located, with Seller being responsible for all such taxes up to Closing. All special assessments levied against the Property and providing for installment payments due after the date of closing shall be prorated and adjusted at Closing. Current Taxes shall mean the winter and summer tax bills issued for the property within twelve (12) months immediately preceding the date of closing.

### B.   Transfer Tax and Recording Fees

Seller shall pay the transfer tax imposed on the transfer of the Premises to Purchaser. Purchaser shall pay all recording fees imposed for recording the deed.

### C. Title Insurance

Seller shall deliver to the Purchaser as soon as may be, a complete commitment for a policy of title insurance, without standard exceptions, issued by Title Connect, for an amount not less than the purchase price hereunder, guaranteeing title in the condition required herein, bearing date later than the acceptance hereof, will be accepted as sufficient showing of title. If the commitment discloses any matters, which are not acceptable to the Purchaser (the "Title Defects"), Purchaser shall notify Seller in writing of such Title Defects within ten (10) days of Purchaser's receipt of the Commitment, and Seller shall have thirty (30) days from the date of Seller's receipt of Purchaser's notice of the Title Defects to have such Title Defects deleted from the Commitment if Seller so elects. If Purchaser fails to notify Seller with such ten day period then Seller accepts the commitment as was provided.

### D. Legal and Other Fees and Expenses

Each party shall bear its own legal fees and other expenses associated with this transaction.

### 7.   Brokerage Fees and Commissions

Each of Seller and Purchaser represents and warrants to the other that it has not engaged or dealt with any real estate agent or real estate broker with respect to the transactions contemplated by this Agreement. If any such real estate agent or real estate broker were to assert a claim for a commission based on an agreement with one of the parties then that party shall indemnify the other party against such a claim.

### 8.   Representations and Warranties by Seller

Seller hereby makes the following representations and warranties to Purchaser as of the Effective Date, and as of the Closing Date:

A. Seller is a Michigan limited liability company and has full power to enter into this agreement and to consummate the transactions provided for herein.

B. Seller is not a "foreign person," as defined by Section 1445 of the Internal Revenue Code. Seller shall comply with all requirements imposed by the Internal Revenue Service in regard to same.

C. This agreement does not conflict with any contract, agreement or commitment to which Seller is a party.

D. No further action of the members of Seller is required to give effect to this agreement or to permit Seller to carry out the transactions contemplated hereby.

E. This agreement constitutes the legally valid and binding obligation of Seller, enforceable in accordance with its terms.

F. Neither the entering into of this agreement nor the consummation of the transactions contemplated hereby will constitute a violation or breach by Seller of any contract, instrument, or other agreement to which it is a party or to which it is subject, or any judgment, order, writ, injunction, or decree issued against or imposed upon it, or will result in any violation of applicable law, order, rule, or regulation of any governmental authority.

G. Seller owns marketable fee simple title to the Property. No other person or entity has any right, claim or interest in the Property or any portion thereof, arising out of adverse possession, prescriptive rights, or otherwise. Seller will deliver at Closing the Premise free and clear of any tenants or leases unless Purchaser gives written notice 45 days prior to Closing of which tenants or leases that it will assume. Copies of any current leases for the Property have been provided to Purchaser as of the Effective Date.

H. Seller has not received any notice of nor does Seller have knowledge of any (a) violation of any law, statute, ordinance, order, regulation, rule, restriction or requirement of any governmental entity pertaining to or affecting any portion of the Property, (b) suit or proceeding pending or threatened affecting Seller or any portion of the Property, or (c) pending applications or commitments to any governmental or quasi-governmental entity or utility which would affect the Property which have not been disclosed in writing to Buyer.

I. Seller has not received any notice from any governmental unit or agency indicating that the premises or any portion thereof, or any operation conducted therein, is in violation of any statute, code, ordinance, or regulation, and, to the best knowledge of Seller, no such violation exists.

J. Seller has never caused or permitted any "hazardous material" (as hereinafter defined) to be placed, held, located, or disposed of on, under, or at the premises or any part thereof, and, to Seller's knowledge, neither the premises nor any part thereof has ever been used as a dump or storage site (whether permanent or temporary) for any hazardous material. As used herein, "hazardous material" means and includes any hazardous, toxic, or dangerous waste, substance, or material, defined as such in, or for purposes of, the Comprehensive Environmental Response, Compensation and Liability Act (42 USC 9601 et seq., as amended) or any other "superfund" or "superlien" law, or any other federal, state, or local statute, law, ordinance, code, rule, regulation, order, or decree regulating, relating to, or imposing liability or standards of conduct concerning any substance or material, as presently in effect. The Property does not contain any underground fuel storage tanks. All info given on hazardous materials is to the best of seller's knowledge.

K. There is no action, suit, litigation, or proceeding of any nature pending, or, to the best knowledge of Seller, threatened, against or affecting the property, or any portion thereof, or which could result in the obtaining of a lien or other interest in the property by any third party, in any court or before or by any federal, state, county, or municipal department, commission, board, bureau, agency, or other governmental instrumentality.

L.   There are no unpaid claims of contractors, materialmen, or laborers which could give rise to a lien against the property. To Seller's knowledge, no work has been performed or is in progress upon, and no materials have been furnished to, the Property or any part thereof, which might give rise to any mechanic's, materialmen's, or other liens against the Property

M.   Seller owns the property free and clear of any and all liens, encumbrances, stipulations, and restrictions and shall deliver to Purchaser, at the closing, a general warranty deed with respect to the property, free and clear of any and all liens, encumbrances, restrictions, and stipulations except those acceptable to Purchaser.

There are no management, employment, service, equipment, supply, maintenance, water,

sewer, or other utility or concession agreement or agreement with municipalities or other

parties (including improvement or development escrows or bonds) with respect to or

affecting the Property which will burden the Property or Purchaser after Closing.

9. <u>Representations, Warranties, and Acknowledgment by Purchaser.</u>

Purchaser makes the following representations and warranties to Seller:

A.   Upon formation, Purchaser will be a limited liability company, duly organized, validly existing, and in good standing under the laws of the State of Michigan, having full power and authority to enter into and perform this agreement.

B.   The execution, delivery, and performance of this agreement have been duly authorized by all necessary corporate action on the part of Purchaser, and no further action of the members of Purchaser is required to give effect to this agreement or to permit Purchaser to carry out the transactions contemplated hereby.

C.   This agreement constitutes the legally valid and binding obligation of Purchaser, enforceable in accordance with its terms.

D.   Neither the entering into of this agreement nor the consummation of the transactions contemplated hereby will constitute a violation or breach by Purchaser of any contract, instrument, or other agreement to which it is a party or to which it is subject, or any judgment, order, writ, injunction, or decree issued against or imposed upon it, or will result in any violation of applicable law, order, rule, or regulation of any governmental authority.

E.   Neither Purchaser nor any of its affiliates, nor any of their respective partners, members, shareholders or other equity owners, and none of their respective employees, officers, directors, representatives or agents, is a person or entity with who U.S. persons or entities are restricted from doing business under regulations of OFAC (including those named on the List) or under any statute, executive order (including the Order), or other governmental action.

10. Plans and Applications.  Purchaser will undertake in good faith to take all such steps necessary to submit all required plans and applications to the City of Pontiac necessary for a marijuana license as soon as reasonably practicable.  Purchaser's legal counsel will certify in writing to Seller that such plans have been submitted within five business days of submission and provide copies of the documents to the Seller with all personal and confidential information being redacted.

11. Closing Contingencies

     The obligations of the parties to close the transactions contemplated hereby shall be subject to the following contingencies:

     A. Contingencies to Seller's Obligation to Close

     The Seller shall be under no obligation to close this transaction unless the following conditions shall have been satisfied, or waived by Seller, in writing, at or prior to the time of closing:

     [1] Purchaser shall have tendered the Purchase Price in immediately available funds.

     [2] All of Purchaser's representations and warranties shall remain true and correct as of the date of closing.

     [3] Purchaser shall have performed its other obligations under this agreement.

     **B.** Contingencies to Purchaser's Obligation to Close

     Purchaser shall be under no obligation to close this transaction unless the following conditions shall have been satisfied or waived by Purchaser, in writing, at or prior to the time of Closing:

     [1]Seller shall have complied with its obligations under the terms of this agreement and shall have tendered a general warranty deed for the property, free and clear of all liens and encumbrances or adverse conditions to title except those acceptable to Purchaser.

     [2]Purchaser shall have until Closing to conduct a physical inspection of the Premises.

     [3]Purchaser shall have until Closing to conduct, or cause to be conducted, an environmental audit of the Premises.

     [4]All of Seller's representations and warranties shall remain true and correct as of the date of Closing.

     [5]There shall exist no condemnation or other proceedings, or other litigation or administrative proceedings of any nature with respect to the premises as of the date of Closing, nor shall any such proceedings be threatened.

     [6]There shall be no parties in possession of any portion of the Property unless consented to in writing by the Purchaser.

     [7]There shall not exist any materially adverse change in the state of title to the property or in the physical condition of the premises from the state of title and the physical condition that exist on the date of this agreement.

     11. Damage

     Until the time of recording of the deed, risk of loss with respect to the premises shall continue to be borne by Seller, in the event that any improvements located upon the Property shall be damaged or destroyed by fire, storm or other casualty before the Closing Date, the Seller Shall repair the damage or

discount the Purchase Price in an amount required to restore the Property. As of Closing, Purchaser shall have an insurable interest in the Property.

12. Condemnation; Other Proceedings

In the event of any condemnation or similar proceedings being instituted during the term of this agreement, Purchaser shall have the option:

A. To elect to close under this Agreement, to pay the Purchase Price for the Premises, and to receive the condemnation proceeds or

B. To elect to terminate this Agreement, recover the Initial Deposit and The Option Payments, and have no further obligation to Seller hereunder.

13. Purchaser's Access to the Property Prior to Closing. Purchaser may, prior to the Closing, through its employees, representatives, attorneys, accountants, or agents, make such further investigation, inspection, discovery and testing of the property which Purchaser deems necessary or desirable. Purchaser shall have the right to have one or more surveys of the Property completed and to make soil tests and other tests of the Property.

14. Property Documents/ Inspection of Property.

A. Within 5 business days following the Effective Date, Seller shall furnish to Purchaser all materials concerning the Property which Seller possesses, and to the extent that the materials exist, or which Seller may reasonably obtain, and Seller shall continue to furnish to Buyer within three (3) business days following Seller's receipt of same, all materials concerning the Property of which Seller acquires possession subsequent to the Effective Date, including, but not limited to, copies of all title insurance policies, plans, plats, surveys, zoning and land use information, contracts, soil tests and reports, environmental tests and reports, engineering studies, inspection reports, due diligence materials, CAD files, appraisals, feasibility studies, landscape plans, site plans and all other governmental and quasi-governmental applications, approvals, consents and authorizations relating to the Property. All of the information to be furnished under this Section shall collectively be referred to as the "Property Documents." At Closing, Seller shall assign to Purchaser all of its right, title and interest in and to the Property Documents and deliver, to the extent available, all of the original Property Documents, Seller's Permits and Intangible Personal Property.

B. Purchaser acknowledges and agrees that Purchaser is relying solely upon its Inspections and due diligence and that Purchaser is purchasing the Property on an "AS IS", "WHERE IS" and "WITH ALL FAULTS" basis, without representations, warranties or covenants, express or implied, of any kind or nature (except as otherwise provided herein). including, but not limited to, the zoning of the Property, the tax consequences to Purchaser, the physical condition of the Real Property, environmental compliance, governmental approvals and compliance of the Real Property with applicable rules, regulations, ordinances and statutes.

15. Miscellaneous Provisions

A. This agreement, together with any exhibits and schedules hereto, which are deemed to be incorporated by reference as if fully set forth at length herein, constitutes the entire written understanding of the parties and supersedes all oral and written understandings of the parties, all of which are deemed to be merged herein. This agreement may not be modified or amended except in writing, signed by each of the parties hereto, or their permitted successors or assigns.

B. This agreement shall be binding upon and shall inure to the benefit of all successors and permitted assigns of the parties hereto.

C. This agreement and the obligations of the parties hereunder shall be governed in all respects by the laws of the State of Michigan.

D. Time shall be of the essence in the performance by Seller and Purchaser of their respective obligations hereunder.

E. When either Purchaser or Seller desires or is required to give notice to the other in connection with and according to the terms of this agreement, such notices shall be addressed as follows:

| | |
|---|---|
| If to Seller: | The Point Investment, LLC |
| | Attn: Mike Yono |
| | P.O. Box 252451 |
| | West Bloomfield, MI 48323 |
| If to Purchaser: | Rubicon Real Estate Holdings, LLC |
| | 900 Wilshire Drive, Suite 300 |
| | Troy, Michigan 48084 |

Such notice shall be deemed to have been given when personally delivered or, if delivery is by certified or registered mail, postage paid, 24 hours after deposit thereof in the United States mails.

## 16. Further Documentation

The parties believe that they have identified all documentation necessary in order to consummate the transactions contemplated by this agreement. In the event, however, that other and further documents, consistent with the terms of this agreement, are necessary in order to consummate the transactions contemplated hereby, each of Seller and Purchaser commits to use its best efforts to provide such documentation as soon as practicable, with the intention that the transactions contemplated hereby shall be completed on or prior to the closing.

## 17. Default and Remedies

In the event of any material default hereunder, the parties shall have the following remedies:

A. In the event of a default by Seller, Purchaser shall have the right to terminate this agreement, or to obtain a decree of specific performance requiring conveyance of the Premises to Purchaser in accordance with the terms of this Agreement or to recover the Deposit and Option Payments. The non-defaulting party shall be entitled to recover all fees and costs, including attorney fees, incurred in enforcing this Agreement.

B. In the event that Seller transfers any right, title or interest in the Property prior to Closing, which transfer prevents Seller from conveying good and marketable title to Purchaser at closing, and Purchaser has provided sufficient evidence of its ability to close on the purchase of the property prior to the

expiration of the last extension option, including making all extension payments required to extend closing as otherwise provided in this Agreement, then the parties agree that Seller shall pay Purchaser liquidated damages in the amount of the Purchase Price and Purchaser shall be able to place lien on the Property in the amount of the Purchase Price in the event of such breach.

C. Notwithstanding anything contained herein to the contrary, in the event specific performance is not available as a remedy, then Purchaser may exercise all remedies available at law or in equity. All of Purchaser's rights and remedies hereunder shall be cumulative, and Purchaser's exercise of any right or remedy shall not preclude Purchaser's exercise of any other right or remedy.

D. Purchaser shall take no action with respect to a Seller's default, and Seller shall take no action with respect to Purchaser's default, until the non-defaulting party has given written notice to the defaulting party and the defaulting party has failed to cure the default within ten (10) days after receipt of such notice.

C. If Purchaser breaches this Agreement, and such breach is not cured in accordance with Section 17 (D), then after 5 days of prior written notice from Seller to Purchaser the Title Company shall deliver the Initial Deposit and any and all Option Payments to Seller as full compensation for its damages and this Agreement shall then terminate in its entirety and Purchaser shall have no further rights hereunder.

### 18. Effectiveness of Agreement

This agreement shall be effective as of the date first set forth above regardless of the date and time of execution by Seller and Purchaser.

### 19. Recording of Short Form Agreement

The parties agree that a short form or memorandum of this agreement, in recordable form, may be executed by each party, at the request of either party, and recorded in the office of the county clerk of Oakland County, Michigan, in order to provide constructive notice of this agreement.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of dates and times set forth below.

Seller:

Point Investment, LLC

Mike Yono, Managing Member          3-27-2019

PURCHASER:

Seller:

Rubicon Real Estate Holdings, LLC

Manuel Ferraiuolo, Member

Joseph Brown, Member

10

## <u>EXHIBIT A</u>

**LEGAL DESCRIPTION**

Exhibit B

## Resolution of the Pontiac City Council



20-29        **Resolution to approve a Zoning Map Amendment request [ZMA 19-08] for 7 & 9 Glenwood Avenue also known as parcel numbers 64-14-21-383-011 & 012, to amend the current site zoning C-1 Local Business to C-3 Corridor Commercial and M-1 Light Manufacturing with CR Conditional Zoning.** Moved by Councilperson Pietila and second by Councilperson Taylor-Burks.

Whereas, the City has received an application for a Zoning Map Amendment for 7 & 9 Glenwood Avenue identified as parcel numbers 64-14-21-383-011 & 012 from Manuel David Ferraiuolo; and
Whereas, the Planning Division has reviewed the applicant's rezoning request and the requirements set forth by Section 6.804 of the Zoning Ordinance, and the Planning Division has determined the aforementioned request and proposed intended use of the property complies with the City of Pontiac Zoning Ordinance; and
Whereas, in accordance with the procedures outlined in the Zoning Ordinance, Sections 6.802 as it relates to Zoning Map Amendments, the request has undergone the required: technical Review, Public Hearing, and Planning Commission Recommendation; and
Whereas, On December 18, 2019, a Public Hearing was held and in consideration of public opinion, the Planning Commission recommends City Council to approve the Zoning Map Amendment request for 7 & 9 Glenwood Avenue approving the change from the current C-1 Local Business to C-3 Corridor Commercial and M-1 Light Manufacturing with CR Conditional Rezoning; and
Now, Therefore, Be It Resolved that the City of Pontiac City Council approve the Planning Commission recommendation for the Zoning Map Amendment (ZMA 19-08) request for 7 & 9 Glenwood Avenue also known as parcel numbers 64-14-21-383-011 & 012, to amend the current site zoning C-1 Local Business to C-3 Corridor Commercial and M-1 Light Manufacturing with CR Conditional Zoning and to allow medical marihuana facilities to locate within the M-1 Light Manufacturing zoned area of the site. Additionally, the CR Conditional Rezoning requires the applicant may only occupy up one hundred thousand square feet of space for medical marihuana non-provisioning facilities until such time that grocery tenant this is minimum of fifteen thousand square feet receives a certificate of occupancy and is open to the public for business.

Ayes: Miller, Pietila, Taylor-Burks, Waterman, G. Williams and K. Williams
No: Carter
**Resolution Passed.**

I, Garland S. Doyle, Interim City Clerk of the City of Pontiac, hereby certify that the above Resolution is a true and accurate copy of the Resolution passed by the City Council of the City of Pontiac on January 21, 2020.

GARLAND S. DOYLE, Interim City Clerk

January 29, 2020

Exhibit C

# LARA Corporations Online Filing System
**Department of Licensing and Regulatory Affairs**

**ID Number: 802407071**

[Request certificate]    [Return to Results]    [New search]

**Summary for:  INNOVATIVE COMMUNITY ELEVATIONS, LLC**

**The name of the DOMESTIC LIMITED LIABILITY COMPANY:**   INNOVATIVE COMMUNITY ELEVATIONS, LLC

**Entity type:**    DOMESTIC LIMITED LIABILITY COMPANY

**Identification Number:** 802407071

**Date of Organization in Michigan:**   03/09/2020

**Purpose:**  All Purpose Clause

**Date of In Existence But Not In Good Standing: 03/01/2023      Term:**   Perpetual

**The name and address of the Resident Agent:**

| | |
|---|---|
| Resident Agent Name: | DWAYNE A LYONS |
| Street Address: | 995 NORTH CASS LAKE RD. |
| Apt/Suite/Other: | 128 |
| City: | WATERFORD    State:  MI    Zip Code:    48328 |

**Registered Office Mailing address:**

| | |
|---|---|
| P.O. Box or Street Address: | P.O BOX 73 |
| Apt/Suite/Other: | |
| City: | KEEGO HARBOR    State:  MI    Zip Code:    48320 |

**Act Formed Under:**   023-1993 Michigan Limited Liability Company Act
**Acts Subject To:**  023-1993 Michigan Limited Liability Company Act

**Managed By:**

Members

**View filings for this business entity:**

ALL FILINGS
ANNUAL REPORT/ANNUAL STATEMENTS
CERTIFICATE OF CORRECTION
CERTIFICATE OF CHANGE OF REGISTERED OFFICE AND/OR RESIDENT AGENT
RESIGNATION OF RESIDENT AGENT
CERTIFICATE OF ASSUMED NAME

[View filings]

**Comments or notes associated with this business entity:**

LARA FOIA Process      Transparency      Office of Regulatory Reinvention      State Web Sites

Michigan.gov Home      ADA      Michigan News      Policies

Copyright 2023 State of Michigan

**LARA** Corporations
Online Filing System
Department of Licensing and Regulatory Affairs

## Business Entity

**Name: INNOVATIVE COMMUNITY ELEVATIONS, LLC**

| Order certified copies | Name of filing | Year filed | Date filed | Filing No. | View PDF |
|---|---|---|---|---|---|
| ☐ | ARTICLES OF ORGANIZATION | | 03/09/2020 | 202030446870 | **202030446870.pdf, 2 pgs** |

Return to entity summary      Order filings

LARA FOIA Process      Transparency      Office of Regulatory Reinvention      State Web Sites

Michigan.gov Home    ADA    Michigan News    Policies

Copyright 2023 State of Michigan