UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RUBICON REAL ESTATE HOLDINGS,
LLC, BROWNE DESIGN CONSULTANTS,
LLC, and JOSEPH BROWN,

                      Case Number 23-10439

          Plaintiffs,                Honorable David M. Lawson

v.

CITY OF PONTIAC and GARLAND S. DOYLE,

          Defendants.

_____/

**OPINION AND ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT AND DISMISSING COMPLAINT**

In 2019, plaintiff Rubicon Real Estate Holdings, LLC, a real estate developer, undertook a project to develop commercial property in Pontiac, Michigan that it intended to lease to tenants operating a grocery store and several medical marijuana cultivation and processing facilities. Rubicon set about lining up potential tenants while also securing zoning changes and obtaining the necessary permits and licenses. It did not encounter smooth sailing with the City of Pontiac and its city clerk, defendant Garland Doyle, who, based on his reading of the local ordinances and a conditional zoning agreement signed by the City and Rubicon, believed that a further ordinance amendment was required before he could issue the necessary licenses and permits. Eventually, the project fell apart, and Rubicon blames the City and Doyle for delaying the necessary approvals, which caused the prospective tenants to pull out of the project. Rubicon accuses the defendants of violating its rights under the Due Process and Equal Protection Clauses of the Fourteenth Amendment, and it posits that the imposition of the City's regulations effectuated a taking of its property in violation of the Fifth Amendment.

Rubicon's managing member is plaintiff Joseph Brown, who also operates a separate business, plaintiff Browne Design Consultants, LLC.  Brown alleges that the City and its mayor caused one of Brown's customers to cancel a lucrative contract in retaliation for the litigation Brown shepherded for Rubicon over the aborted real estate deal.  Included in this case is a claim by Brown and his design firm for violation of his rights under the First Amendment.

After discovery closed, the defendants moved for summary judgment on all claims. Because the evidence in the record does not establish any material fact issues, and the uncontested facts do not support all the elements of the plaintiffs' claims, the motion will be granted and the complaint will be dismissed.

I.

A.

Plaintiff Rubicon Real Estate Holdings, LLC sought to transform an approximately 20-acre parcel of derelict land located on Glenwood Avenue in Pontiac, Michigan into a mixed-use development with a grocery store and light manufacturing facilities focused on medical marijuana growing and cultivation.  To achieve that goal, the zoning of the property had to be changed.

Although the use, possession, and manufacture of marijuana was illegal under federal law in 2019 when the project was initiated — and still is, *see* 21 U.S.C. §§ 841(a), (b)(1)(A)(vii), (B)(vii), 844a(a) — over time, Michigan citizens warmed to the idea and liberalized the state's regulation of marijuana.  In 2008, the production and use of medical marijuana was approved by Michigan voters.  In 2016, Governor Rick Snyder signed a law regulating medical marijuana businesses.  And in 2018, voters approved a ballot initiative legalizing recreational marijuana use, which became the Michigan Regulation and Taxation of Marihuana Act, Mich. Comp. Laws § 333.27951.

The following year, the City of Pontiac adopted ordinances permitting recreational marijuana uses in the City. It also amended its zoning ordinances to create Medical Marijuana Overlay Districts, which granted permission for certain medical marijuana businesses to operate within certain portions of the City. *See* Pontiac, Mich., Code § 3.1101-3.1102. Outside those districts, properties with the requisite business zoning must obtain a special exception permit from the City's Planning Commission. *Id.* § 3.1106. In addition, marijuana businesses also must obtain a business license from the City (which has a detailed set of requirements) and a license from the State. *Id.* §§ 3.1105, 26-1498(c) (listing required information).

Rubicon began the redevelopment process on March 29, 2019, when it acquired the Glenwood property pursuant to a purchase agreement that required it to "undertake in good faith to take all such steps necessary to submit all required plans and applications to the City of Pontiac necessary for a marijuana license as soon as reasonably practicable." ECF No. 63-2, PageID.1163. All parties agree that the Glenwood property falls outside of the Overlay Districts. On July 3, 2019, Rubicon applied to rezone the property from C-1 (local business/residential mixed use) to C-3 Corridor Mixed Use and M-1 Limited Industrial designations, but not to expand the Overlay Districts. ECF No. 57-3. Although the City's marijuana ordinance permits certain medical marijuana uses outside the Overlay Districts in these zones, medical marijuana growing and processing facilities — the primary uses Rubicon intended for the site — are explicitly excluded. *See* Pontiac, Mich., Code § 3.1109. It appears that City planning staff intended to resolve this issue by having the City Council place the Glenwood property within an Overlay District. *See* ECF No. 57-8, PageID.758. But that never happened.

Rubicon's zoning application ultimately received a favorable recommendation from the City's Planning Commission, and on January 21, 2021, the City Council voted to approve the

zoning change.  The Council also entered into a Conditional Rezoning Agreement (CRA) with Rubicon, which included the following language: "The zoning use district regulations for the Property shall be based upon the C-3 Corridor Commercial and M-1 Light Manufacturing for the purposes of allowing cannabis growing and processing facilities along with a mix of traditional users allowed under the C-3 and M-1 zoning districts."  ECF No. 57-10, PageID.772.  However, it does not appear that the City acted on a staff recommendation to add the property to the Overlay Districts.

While Rubicon's zoning application was pending, it began formalizing relationships with potential tenants.  Pharmaco, Inc., a medical marijuana company, applied for City business licenses to operate as a medical marijuana grower and processor on the property.  ECF No. 57-4.  It then executed a lease agreement with Rubicon in February of 2020, shortly after the re-zoning had been approved by the City Council.  ECF No. 57-13.  The operative terms of that lease governing when Rubicon would be entitled to rent payments are disputed.  In March of 2020, Rubicon signed a letter of intent with Hollywood Markets to operate a grocery store on the site.  ECF No. 57-14. And in July of 2020, Family Rootz, LLC filed its applications for City licenses to grow and process medical marijuana on the site, but there is no evidence in the record that it signed a lease with Rubicon.  ECF Nos. 57-21, 57-22.

On July 15, 2020, City Clerk Garland Doyle notified Pharmaco that its applications were missing several required items and gave it fourteen days to rectify the issues.  ECF Nos. 57-15, 57-16.  Pharmaco appears to have timely corrected the problems Doyle had identified.  After nearly six months, however, neither Pharmaco nor Family Rootz had obtained City approval.  On January 7, 2021, Rubicon's attorneys wrote a letter to the City Council complaining about the delays in Doyle's processing Pharmaco's and Family Rootz's applications.  ECF No. 63-6.  According to

the attorney's letter, Clerk Doyle had indicated to the applicants that he was unable to issue licenses because of his belief that the proposed uses were not allowed outside the Medical Marijuana Overlay Districts. *Id.* at PageID.1188. Rubicon's counsel insisted, however, that Doyle's interpretation of the City's ordinances was incorrect, because section 3.1106 allows medical marijuana uses outside an Overlay District subject to Planning Commission approval, and the CRA expressly contemplated growing and processing operations on the site. *Ibid.* It is not clear if the letter prompted any Council action. Nevertheless, on January 29, 2021, Doyle wrote to both Pharmaco and Family Rootz identifying further deficiencies with their applications, including their lack of a security plan, an appropriate scale diagram, and a location map signed by a licensed surveyor. ECF Nos. 57-24, 57-25, 57-26, 57-27. They were allowed 21 days to provide additional documentation. Curiously, each of the notices states that the applicant's compliance with Zoning Ordinance (application section 9(b)(2)) was "satisfactory" because the site was zoned M-1. But the form included this comment: "Applicant to obtain Special Exception Permit and site plan approval by Planning Commission." *E.g.*, ECF No. 57-27, PageID.901.

At its February 16, 2021 meeting, the City Council heard from Clerk Doyle and representatives from Rubicon about the dispute over the issuance of the permits. ECF No. 63-7, PageID.1192. The Rubicon team stated that they had anticipated obtaining the Special Exception Permits from the Planning Commission *after* Pharmaco and Family Rootz had received their City business licenses but had secured them earlier that month "in an attempt to move things forward." ECF No. 63-8, PageID.1201. Clerk Doyle continued to assert that it would be illegal for him to issue a "license" to a marijuana business operating outside an Overlay District. ECF No. 63-9, PageID.1214. In his presentation notes, Doyle wrote that the CRA contemplated an amendment to the zoning ordinance — likely to amend the Overlay Districts — and faulted the Planning

Commission for failing to bring the amendment forward. ECF No. 63-5, PageID.1184-85. The record contains no indication that the City Council took action after the hearing.

Rubicon ultimately decided to take legal action. Along with Family Rootz, it filed a complaint against the City and Doyle in the Oakland County, Michigan circuit court seeking mandamus and declaratory relief in an effort to secure the business licenses. ECF No. 57-32. The court denied the request for mandamus but ultimately granted a motion for declaratory relief on May 21, 2021. The court ordered the City to issue licenses to Family Rootz and Pharmaco. ECF No. 57-34, PageID.996. The same day, Doyle issued yet another round of deficiency notices to Pharmaco and Family Rootz, *see* ECF Nos. 57-28, 57-29, 57-30, 57-31, but he ultimately complied with the court order and issued Family Rootz's approval on May 27, 2021 and Pharmaco's on June 3, 2021. ECF Nos. 57-37, 57-38.

Apparently, the approvals came too late to save the project. In a written statement styled as an "affidavit," which is neither dated nor sworn to, Pharmaco vice president Fernando Carlo stated that he terminated the lease agreement with Rubicon on June 18, 2021 "due to lengthy delays." ECF No. 57-55, PageID.1100. Family Rootz pulled out of the project on September 11, 2021. Aff. of Jeremiah Kromrei, ECF No. 63-10, PageID.1219. (This document suffers from the same defects.) As its partners pulled out, Rubicon was unable to secure financing for the project from its lenders.

### B.

Plaintiff Joseph Brown, Rubicon's managing member, alleges that Rubicon's state court lawsuit sparked recriminations from City officials. He leads Browne Design Consultants, LLC, also a plaintiff. In an undated declaration, Brown states that Browne Design was retained by SK

- 6 -

Properties (another developer) to assist with a separate project in Pontiac.  Undated Decl. of Joseph Brown, ECF No. 63-3, PageID.1177.

On August 22, 2022, SK Properties' principal, Tzvi Koslowe, met with Pontiac Mayor Timothy Greimel, councilwoman Melanie Rutherford, and former Planning Manager Vern Gustafsson.  *Ibid.*  During the meeting, Mayor Greimel allegedly told Koslowe that if he wanted to obtain City approval for his project, he needed to fire Browne Design.  *Ibid.*  Somewhat oddly, the plaintiffs' discovery responses indicate that Councilwoman Rutherford made the statement about canceling the contract, ECF No. 67-4, PageID.1276, but their briefing indicates that the mayor said that.  In any event, Brown says that SK Properties ultimately canceled the contract with Browne Design as a result of the request.  For his part, Greimel denies telling Koslowe that he needed to cancel the contract and insists that he merely shared his opinion that Brown had not performed well at a meeting intended to explain SK's project to the public and that Koslowe might want to find an alternate spokesperson for future events.  ECF No. 67-6, PageID.1290-91.

C.

In January of 2023, Rubicon, Browne Design, and Brown filed this lawsuit against the City and Doyle in Oakland County, Michigan circuit court.  The defendants removed the case to this Court.  The four-count complaint alleges that the "defendants" denied Rubicon the equal protection of the laws via 42 U.S.C. § 1983 by selectively "targeting" the plaintiffs and their property for enforcement of certain procedures, presumably for approval of zoning permits of business licenses for their prospective tenants (Count I); deprived Rubicon of property without due process (Count II); unlawfully retaliated against the "plaintiffs," presumably Brown and his company, based on the protected activity of filing the first case in the state circuit court (Count III); and committed a

taking of Rubicon's property without just compensation in violation of the Fifth Amendment (Count IV).

Discovery is closed and the defendants move for summary judgment on all counts.

## II.

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When reviewing the motion record, "[t]he court must view the evidence and draw all reasonable inferences in favor of the non-moving party, and determine 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).

The party bringing the summary judgment motion must inform the court of the basis for its motion and identify portions of the record that demonstrate that no material facts are genuinely in dispute. *Id.* at 558 (citing *Mt. Lebanon Pers. Care Home, Inc. v. Hoover Universal, Inc.*, 276 F.3d 845, 848 (6th Cir. 2002)). "Once that occurs, the party opposing the motion then may not 'rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact' but must make an affirmative showing with proper evidence in order to defeat the motion." *Ibid.* (quoting *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989)).

## A.

At oral argument on the motion, the parties acknowledged that the pleadings actually frame two lawsuits in one. One involves Rubicon's various constitutional violation theories based on

the delay in issuing business licenses and permits to its prospective tenants, which, it says, doomed the development project. The other is the First Amendment retaliation claim.

Before turning to the parties' arguments, it is useful to identify the claims that pertain to each of the plaintiffs and which claims are directed at either or both of the defendants. First, there are no allegations — and certainly no evidence — that Browne Design Consultants or Brown personally suffered any harm due to the unraveling of the Glenwood project; the plaintiffs' due process, equal protection, and takings claims all are associated with that issue. Those claims will be dismissed as to plaintiffs Brown and Browne Design. Second, there is no evidence that Rubicon was harmed by the alleged retaliation, which took place more than a year after the failure of the development. That claim will be dismissed as to plaintiff Rubicon. Third, there is no suggestion in the record that defendant City Clerk Doyle played any role in the alleged retaliation by the City against Brown and Browne Design. That claim (Count III) will be dismissed as to defendant Doyle.

## B.

On Counts I, II, and IV, the defendants argue that Clerk Doyle is entitled to qualified immunity, and that the plaintiffs have identified no custom or policy that would justify *Monell* liability against the City. The plaintiffs maintain that Doyle is not entitled to qualified immunity because he violated their constitutional rights by refusing to issue business licenses to which Rubicon was entitled under the CRA and could not reasonably have believed that his position was correct. Responding to the *Monell* argument, they contend that Doyle had final decision-making authority with respect to the issuance of approvals for medical marijuana facilities and that the City Council ultimately adopted his position during its February 2021 meeting when they heard from Doyle and representatives of Rubicon.

The qualified immunity doctrine insulates state actors from liability as long "as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  Once the qualified immunity defense is raised, a plaintiff "must show that (1) the defendant violated a constitutional right and (2) that right was clearly established." *McDonald v. Flake*, 814 F.3d 804, 812 (6th Cir. 2016) (citing *Quigley v. Tuong Vinh Thai*, 707 F.3d 675, 680 (6th Cir. 2013)).  Defendant Doyle argues that Rubicon cannot establish either element.  The motion can be decided on the first element.

For the first component, the constitutional claims are brought via 42 U.S.C. § 1983, which provides a vehicle for individuals to seek redress in court for violations of rights secured by the Constitution and laws of the United States. To state a claim under that section, "a plaintiff must set forth facts that, when construed favorably, establish (1) the deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under the color of state law." *Dominguez v. Corr. Med. Servs.*, 555 F.3d 543, 549 (6th Cir. 2009) (quoting *Sigley v. City of Parma Heights*, 437 F.3d 527, 533 (6th Cir. 2006)).  It is well settled that a civil rights plaintiff must allege the personal involvement of a defendant to state a claim under section 1983 and that liability cannot be based upon a theory of *respondeat superior* or vicarious liability.  *Monell v. Department of Social Servs.*, 436 U.S. 658, 691-92 (1978).  "Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009); *see also Frazier v. Michigan*, 41 F. App'x 762, 764 (6th Cir. 2002) (citing *Hall v. United States*, 704 F.2d 246, 251 (6th Cir. 1983)) (holding that the "complaint must allege that the defendants were personally involved in the alleged deprivation of federal rights.").

To prevail on a section 1983 claim against a municipal authority, the plaintiffs must show that (1) they suffered a constitutional violation and (2) either a custom of toleration for illegal practices or the ratification of a violation by an official with final decision-making authority directly caused the constitutional injury. *Monell*, 436 U.S. at 691 (holding that "a municipality cannot be held liable under § 1983 on a *respondeat superior* theory"); *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986) (holding that a plaintiff can demonstrate an official policy by pointing to a decision of an official with final decision-making authority over the matter at issue).

1.

Rubicon bases its Equal Protection claim in Count I of its complaint on the theory that the City treated marijuana businesses located in the Overlay District differently from Rubicon's property, despite the zoning approval. It also contends that there is evidence that Rubicon was intentionally targeted for mistreatment based on the fact that its tenants received less time to cure deficiencies in their applications.

To prevail on its equal protection claim, Rubicon must show that "the government treated [it] 'disparately as compared to similarly situated persons and that such disparate treatment either burdens a fundamental right, targets a suspect class, or has no rational basis.'" *Center for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 379 (6th Cir. 2011) (quoting *Club Italia Soccer & Sports Org., Inc. v. Charter Township of Shelby, Michigan*, 470 F.3d 286, 299 (6th Cir. 2006)). Where, as here, a plaintiff does not contend that a municipality's actions burden any fundamental right and has not suggested that it is a member of any suspect class, then the plaintiff still may proceed as a "class of one," but to do so it must put forth evidence that it "has been intentionally

treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000).

That is no easy task, because "there is a strong presumption that the state actors have properly discharged their official duties, and to overcome that presumption the plaintiff must present clear evidence to the contrary." *Stemler v. City of Florence*, 126 F.3d 856, 873 (6th Cir. 1997) (citing *United States v. Armstrong*, 517 U.S. 456, 464 (1996)).  "If there is any reasonably conceivable state of facts that could provide a rational basis for the state's conduct, then the state has not violated the constitution." *Systematic Recycling LLC v. City of Detroit*, 635 F. App'x 175, 181 (6th Cir. 2015) (citations and quotations marks omitted).

Rubicon's framing of its equal protection class-of-one claim requires that it demonstrate that "(1) the City 'intentionally treated' [it] 'differently from others similarly situated' and (2) 'there is no rational basis for the difference in treatment.'" *Green Genie, Inc. v. City of Detroit*, 63 F.4th 521, 527 (6th Cir. 2023) (quoting *Vill. of Willowbrook*, 528 U.S. at 564).  Starting with the first element, Rubicon does not point to any direct evidence that resembles intentional discrimination.  Although the complaint includes allegations of First Amendment retaliation, the factual allegations are tied to its co-plaintiffs, not to it; and the underlying allegations are based on statements by City officials allegedly made more than a year after the denial of permits to Rubicon's tenants.  Rubicon's briefing does not suggest that the statements are evidence of intentional discrimination.

This lack of direct evidence is not necessarily fatal.  A common approach "is to attempt to demonstrate intentional discrimination through circumstantial evidence." *Green Genie*, 63 F.4th at 527-28 (citing *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264-66 (1977)).  That requires showing "that the adverse treatment . . . was such a stark outlier from an

otherwise consistent pattern of favorable treatment in similarly situated cases." *Stanislaw v. Thetford Twp.*, No. 23-1756, 2025 WL 233215, at *6 (6th Cir. Jan. 17, 2025) (quoting *Green Genie*, 63 F.4th at 528). "'Similarly situated' is a term of art — a comparator business must be similar in 'all relevant respects.'" *Paterek v. Vill. of Armada*, 801 F.3d 630, 650 (6th Cir. 2015) (quoting *United States v. Green*, 654 F.3d 637, 651 (6th Cir. 2011)). This comparison is a product of the specific "facts and context of the case." *Loesel v. City of Frankenmuth*, 692 F.3d 452, 463 (6th Cir. 2012).

Rubicon maintains that Doyle and the City treated it differently than similarly-situated entities, in this case, property owners whose properties fell inside the City's Medical Marijuana Overlay Districts. They point out that other businesses, including PGSH Holdings, LLC, PAAJK Holdings and Nature's Gold, received letters from Doyle that provided additional time to furnish missing information compared with its prospective tenants and that these businesses never needed to seek legal redress to obtain permits. Rubicon's position about the relevance of these potential comparators is somewhat confusing. For instance, it does not represent that they also are property owners. This difference could be overlooked, but its argument that these businesses received more favorable treatment than its own prospective tenants is at odds with the record. There is no evidence that any of the three businesses it identifies ever received a City business license. Instead, it appears that one of the proposed comparators' applications ultimately was denied. *See* ECF No. 57-36. And the deficiency notices received by the proposed comparators and its own tenants are notable for their similarity. Among other things, the deficiency notices issued to PGSH Holdings, LLC, PAAJK Holdings and Nature's Gold identify issues with the businesses' security plans, diagrams, proposed graphic materials, floor plans, business plans, community outreach strategies, and proof of insurance. *See* ECF Nos. 57-17, 57-18, 57-19. Pharmaco and Family Rootz's

applications faced similar issues, according to their deficiency notices. *See* ECF No. 57-16 (identifying Pharmaco's lack of a capital investment plan, explanation of economic benefits, facilities sanitation plan, and proof of insurance); ECF No. 57-24 (noting that application lacked compliant security plan, floor plan, scale diagram, and location map); ECF No. 57-26 (listing similar issues with Family Rootz's applications). Rubicon's position that its tenants received fewer days to correct deficiencies (14 compared to 21) also appears overstated and only seems to have been the case for Pharmaco's deficiency notice in July of 2020, the earliest in the record. Pharmaco's second deficiency notice in January of 2021 — issued concurrently with Family Rootz's first notice — offers 21 days to correct deficiencies. ECF Nos. 57-24; 57-26. Even if there were some discrepancy, Rubicon does not explain how this timing difference rises to the level of an equal protection violation, especially since Pharmaco supplied the additional information on time. *EJS Props., LLC v. City of Toledo*, 698 F.3d 845, 866 (6th Cir. 2012) ("Gaps in time and context may suggest a change in policy rather than differential treatment."). Rubicon never suggests that its tenants were harmed by any shortened response window. The record simply does not bear out Rubicon's assertion that its tenants were treated differently than the comparators it identifies in any material way. The failure of proof on this basic element is fatal to its equal protection claim.

Even if Rubicon had demonstrated that its proposed comparators were similarly situated and the record revealed a stark difference in treatment, it runs headlong into Sixth Circuit caselaw holding that a City's "sloppy administration of its permitting system and misapplication of local law is insufficient to show an equal protection violation." *Green Genie*, 63 F.4th at 529. At most, its proofs show that Doyle's assertion that he could not issue permits to the marijuana cultivation and processing tenants was incorrect, not that it was driven by any ill-will or intentional

discrimination.  Rubicon has not created a fact question on the essential elements of its equal protection claim.  That claim will be dismissed.

2.

In Count II of its complaint, Rubicon confounds procedural and substantive theories in its denial-of-due-process claim.  For each theory, however, Rubicon must show a deprivation of a constitutionally protected right (life, liberty, or property).  In this case, the parties agree that the right at issue would be a property right.  *See Prater v. City of Burnside*, 289 F.3d 417, 431-32 (6th Cir. 2002).  The parties part ways about whether the plaintiffs' claimed interest is constitutionally protected, at least as to Rubicon.

a.

The defendants contend that the property interests in this case belong to Rubicon's tenants, Pharmaco and Family Rootz.  That argument does not persuade.  Rubicon's property interest is in the rents it would have earned from its confirmed tenants had they secured the business licenses that the City delayed issuing.  "Under principles established in prior United States Supreme Court cases, . . . a landlord's interest or expectation in receiving monies due under a rental agreement is a 'property interest' within the meaning of the fourteenth amendment."  *Chernin v. Welchans*, 844 F.2d 322, 325 (6th Cir. 1988) (citing *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532 (1985); *Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1 (1978); *Bd. of Regents v. Roth*, 408 U.S. 564 (1972)).  The evidence establishes that Rubicon's expectation of rents was sufficiently certain to extend beyond speculation, hope, or desire.  *See Green Genie, Inc. v. City of Detroit, Michigan*, 63 F.4th 521, 526 (6th Cir. 2023) (recognizing that "one must have a 'legitimate claim of entitlement to' the purported property interest, as opposed to an abstract need or desire") (citing

- 15 -

*Roth*, 408 U.S. at 577).  Pharmaco had signed a lease, and both it and Family Rootz had applied for business licenses with the intention of occupying the buildings.

The viability of those prospective leases, however, was contingent on the issuances of the business permits and licenses, which Rubicon had attempted to secure through its zoning negotiations with the City.  "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire" and "more than a unilateral expectation of it.  He must, instead, have a legitimate claim of entitlement to it." *Town of Castle Rock, Colo. v. Gonzales*, 545 U.S. 748, 756 (2005) (quotations omitted).  In the land-use context, the Sixth Circuit has explained that a property owner may have a protected property interest in an existing zoning classification or in a re-zoning after it is approved. *EJS Properties*, 698 F.3d at 856.  In some cases, a property interest arises pre-approval if the public body lacks discretion to deny it. *See Silver v. Franklin Twp. Bd. of Zoning Appeals*, 966 F.2d 1031, 1036 (6th Cir. 1992).  If, however, a public body retains discretion "to deny . . . a conditional zoning certificate . . . even if [it] complie[s] with certain minimum, mandatory requirements," then the owner does not have a legitimate claim of entitlement to that use. *Ibid.*  But "[s]uch a property interest would exist . . . if the board's discretion were so circumscribed that approval of the plaintiff's proposed use of the property became mandatory once he complied with the minimal requirements imposed on him." *Brown v. City of Ecorse*, 322 F. App'x 443, 445-46 (6th Cir. 2009).

Here, Rubicon argues that it had the zoning change in hand by virtue of the CRA signed by the City converting the zoning on the property to C-3 and M-1, which was necessary for the tenants' businesses to operate.  That is true.  However, that zoning change while necessary, was not a sufficient condition for the leases to have any value.  A marijuana business seeking to open its doors also must obtain a city business license, which comes with its own host of eligibility

criteria and discretionary determinations.  Clerk Doyle initially turned back the tenants' business license applications because of deficiencies, which they attempted to correct.  But he eventually expressed the opinion that the zoning change itself was insufficient to allow him to issue those licenses because the Glenwood property had not yet been included in an Overlay District, or, alternatively, no one had obtained a Special Exception Permit, *see* Pontiac, Mich., Code § 3.1106, which, he thought, was a required condition precedent for the uses that the tenants contemplated.

Doyle's reading of the Pontiac ordinances was reasonable.  Certainly, the CRA included certain representations about the operation of medical marijuana growing and processing businesses on the site, stating that the purpose of the rezoning was to "allow[] cannabis growing and processing facilities."  ECF No. 57-10, PageID.772.  But these uses only are permitted in the C-3 and M-1 zoning district once a business applicant obtains a special exception from the Planning Commission.  *See* Pontiac, Mich. Code § 3.1109.  It is far from clear that the language in the CRA exempted Rubicon's project from the typical requirement for these uses in the zoning code that they receive Planning Commission approval.  But because a factfinder could conclude reasonably that the City's intention when executing the CRA was to allow a marijuana business to operate on the Glenwood property (and in fact the state circuit court actually reached that conclusion in an earlier lawsuit), Rubicon's expectation in its tenants' entitlement to the issuance of the business licenses was "legitimate."  *Castle Rock*, 545 U.S. at 756; *Silver*, 966 F.2d at 1036.  And a reasonable factfinder, in turn, could find that Rubicon might have received rents from both tenants had their applications not been held up.

The defendants also argue, however, that even if Rubicon does have a property interest, it is not a legitimate one protected by the Due Process Clause because marijuana cultivation remains illegal under federal law.  Michigan has legalized many aspects of marijuana cultivation, but that

is not necessarily dispositive.  The Supreme Court has explained that "[a]lthough the underlying substantive interest is created by 'an independent source such as state law,' *federal constitutional law* determines whether that interest rises to the level of a 'legitimate claim of entitlement' protected by the Due Process Clause." *Castle Rock*, 545 U.S. at 757 (quoting *Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 9 (1978)).  As the defendants point out, some courts have expressed deep skepticism that marijuana-affiliated businesses have legitimate protectable interests in their property because marijuana possession remains illegal under federal law.  *See, e.g.*, *Borges v. Cnty. of Mendocino*, 506 F. Supp. 3d 989, 998-99 (N.D. Cal. 2020) ("[M]arijuana cultivation remains illegal under federal law.  As such, the Court agrees with the reasoning of the other courts that have addressed this question and concludes that plaintiffs do not have federally protected property interest in cultivating medical marijuana and thus that they cannot state a claim under § 1983 for violation of their due process rights."); *Grandpa Bud, LLC v. Chelan Cnty. Wash.*, No. 19-51, 2020 WL 2736984, at *4 (E.D. Wash. May 26, 2020) ("The Court finds that the alleged property interest in this case is indistinguishable from federally unauthorized cannabis cultivation, which is not a protectable property interest under the U.S. Constitution."); *Benno v. Shasta Cnty., Calif.*, No. 16-01110, 2020 WL 7024059, at *7 (E.D. Cal. Nov. 30, 2020) ("[T]here is no property right in medical marijuana that is recognized by the Fourteenth Amendment.").

The defendants also cite *Virdis Laboratories, LLC v. Kluytman*, No. 22-283, 2023 WL 5058087, at *2-3 (W.D. Mich. June 20, 2023), *report and recommendation adopted*, 2023 WL 4861698 (W.D. Mich. July 31, 2023), where the district court reached a similar conclusion.  In that case, two licensed Michigan marijuana facilities sued members of the State's Marijuana Regulatory Agency after it conducted a recall of certain products, alleging that the officials violated their rights under the Fourteenth Amendment.  *Virdis*, 2023 WL 5058087, at *1.  The

court held that the plaintiffs had failed to state a claim, reasoning that although Michigan had legalized the use of marijuana, it remained contraband under federal law, so there could be no federal constitutional property interest "in [the plaintiff's] license to perform marijuana safety tests [or] a liberty interest to engage in this endeavor." *Id.* at *2. The court rejected the plaintiffs' argument that it held a property interest in its state-issued license to conduct marijuana testing, emphasizing that this alleged interest "do[es] not exist in a vacuum" and must be considered alongside the fact that the license "authorizes Plaintiff to perform testing on a product which the United States has prohibited." *Ibid.*

The plaintiffs here make little effort to respond to the argument and instead merely repeat their contention that Rubicon had "interests in using its land for the purpose for which it had been re-zoned . . . ." ECF No. 63, PageID.1134. But that oblique reference is sufficient to distinguish this case from the decisions cited above, which deal with a claimed property right to possess, cultivate, test, or distribute marijuana, medical or otherwise. Rubicon's claimed property right is in the rents that it would derive from the leases that were never consummated because of the City's delay issuing business licenses. It is worth emphasizing that the right was not in the business licenses themselves, but in the revenue that would have been generated had their prospective tenants been allowed to conduct business on the Glenwood property. Compare *Naturale & Co. v. City of Hamtramck*, 614 F. Supp. 3d 575 (E.D. Mich. 2022), where the court held that two marijuana companies had a protectable property right in a certificate of occupancy for buildings they had leased and outfitted pursuant to permits issued by the City. *Id.* at 579. Despite the City's contention that the plaintiffs had no due process rights in the possession or cultivation of marijuana, the court found that this argument "conflate[s] plaintiffs' potential right to sell marijuana with plaintiffs' property right to certificates of occupancy for their leaseholds." *Id.* at 580. The court

added that a certificate of occupancy is not necessarily determinative of its ultimate state approval to sell marijuana at the site and, in fact, was *not* a final approval to sell marijuana. *Ibid.*; *see also Santa Barbara Patients' Collective Health Co-op. v. City of Santa Barbara*, 484 F. App'x 153, 154 (9th Cir. 2012) (affirming the holding that the district court acted reasonably in finding that a medical marijuana dispensary was likely to succeed on its claim that it had a vested property right in operating the dispensary).

Recognizing Rubicon's property right would not require the Court to endorse activity that has been declared unlawful under federal law. Rubicon, after all, is not seeking redress for the defendants' interference with its own marijuana business. "[T]he fact that [the plaintiffs'] economic harms [are] related to cannabis is not relevant to whether a court could, theoretically, fashion a remedy to redress their injuries." *Shulman v. Kaplan*, 58 F.4th 404, 409 (9th Cir. 2023). Rubicon's property interest is "a 'legitimate claim of entitlement' protected by the Due Process Clause." *Castle Rock*, 545 U.S. at 757.

b.

Once the plaintiffs have established that they have a property interest protected by the Due Process Clause, they then must show "that they were deprived of this property interest; and that the [government] did not afford them adequate pre-deprivation procedural rights." *Cahoo v. SAS Analytics Inc.*, 912 F.3d 887, 900 (6th Cir. 2019). In addition, where the allegation is that the plaintiffs were denied a fair hearing, the "procedural due process claim requires a showing of prejudice." *Mendoza-Garcia v. Barr*, 918 F.3d 498, 508 (6th Cir. 2019) (citing *Graham v. Mukasey*, 519 F.3d 546, 549 (6th Cir. 2008) ("In order to prevail on a procedural due process challenge, Graham must also show prejudice. Indeed, we need not address the merits of a claim if there is no demonstration of prejudice."); *Al Khouri v. Ashcroft*, 362 F.3d 461, 466-67 (8th Cir.

- 20 -

2004); *Agyeman v. INS*, 296 F.3d 871, 884 (9th Cir. 2002)). "To prove prejudice, he must show that his 'claims could have supported a different outcome.'" *Ibid.* (quoting *Sako v. Gonzales*, 434 F.3d 857, 864 (6th Cir. 2006)).  In order words, they must establish that the information that they wanted to present could have changed the outcome of the proceeding, if they had been afforded the full benefit of the process to which they were entitled. *Ibid.*

The plaintiffs' complaint does not plead facts suggesting that Rubicon suffered a "deprivation" as such, or that the City failed to afford it adequate procedures to address the delay encountered with the business licenses of its prospective tenants.  They take a different position in their brief opposing the defendants' summary judgment motion, asserting that Clerk Doyle's refusal to issue the business licenses was the critical deprivation.  However, the record does not disclose a formal denial by the City of the business license applications, and there is no discrete act that effectuated an interference with a business license, as one might see, for example, with a license revocation, *e.g.*, *Barry v. Barchi*, 443 U.S. 55, 65-66 (1979), or the imposition of a penalty, *e.g.*, *Daily Servs., LLC v. Valentino*, 756 F.3d 893 (6th Cir. 2014).  Identifying the deprivation that the plaintiffs allege is important for determining the appropriate procedures that the City should have afforded in advance.  *See Mathews v. Eldridge*, 424 U.S. 319, 348-49 (1976) (declaring that other than giving a person "notice of the case against him and [an] opportunity to meet it," there are no hard and fast rules that prescribe the adequacy of process demanded by the Constitution).

Here, the dispute centered on Clerk Doyle's reading of the city ordinances and his understanding of the requirements for issuing the business licenses to Pharmaco and Family Rootz. Rubicon was able to take that issue to the city council and air it before any final decision was made to refuse the license.  Doyle had notified the applicants on January 29, 2021 of deficiencies in their applications, further indicating the expectation that they would "obtain [a] Special Exception

Permit and site approval from the Planning Commission." ECF No. 57-27, PageID.901. Rubicon took exception that any further approvals were needed after the CRA was executed, and its attorneys and representatives presented a fulsome rebuttal in writing and at the City Council meeting of February 16, 2021. Letter from Attorney Weikert, ECF 63-6, PageID.1187-89; Meeting Minutes, ECF 63-7, PageID.1192.

Again, the record does not contain a specific denial of the license applications after that Council meeting, although one certainly can infer one from the City's inaction, coupled with the litigation Rubicon commenced in the state court to obtain the approvals. However, no matter how one might characterize the alleged "deprivation," the record does not support the claim that it was due to constitutionally inadequate procedures. The plaintiffs' procedural due process claim fails on this record.

c.

Courts have recognized that the Due Process Clause includes a substantive component, which acts as a check on the power of the government vis-à-vis its citizens. "[S]ubstantive due process . . . serves the goal of preventing governmental power from being used for purposes of oppression, 'regardless of the fairness of the procedures used.'" *Howard v. Livingston Cnty., Michigan*, No. 21-1689, 2023 WL 334894, at *11 (6th Cir. Jan. 20, 2023) (quoting *Daniels v. Williams*, 474 U.S. 327, 331 (1986)). It prohibits the government from infringing on "fundamental rights" without sufficient justification. *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997). To establish a substantive due process claim, a plaintiff must show that "(1) a constitutionally protected property or liberty interest exists, and (2) the constitutionally protected interest has been deprived through arbitrary and capricious action." *Paterek v. Vill. of Armada, Mich.*, 801 F.3d

- 22 -

630, 648 (6th Cir. 2014) (quoting *Braun v. Ann Arbor Charter Twp.*, 519 F.3d 564, 573 (6th Cir. 2008)).

"[T]he plaintiff must allege 'conduct intended to injure in some way unjustifiable by any government interest' and that is 'conscience-shocking' in nature." *Mitchell v. McNeil*, 487 F.3d 374, 377 (6th Cir. 2007) (quoting *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998)). "What seems to be required is an intentional infliction of injury . . . or some other governmental action that is 'arbitrary in the constitutional sense.'" *Stemler v. City of Florence*, 126 F.3d 856, 869 (6th Cir. 1997) (quoting *Lewellen v. Metro. Gov't of Nashville & Davidson Cnty.*, 34 F.3d 345, 351 (6th Cir. 1994)). If a party's actions survive rational basis scrutiny, it has not acted arbitrarily or capriciously. *Shavers v. Almont Twp., Mich.*, 832 F. App'x 933, 940 (6th Cir. 2020) (citing *Brody v. City of Mason*, 250 F.3d 432, 438 (6th Cir. 2001)).

The Sixth Circuit has explained that "[t]o sustain a substantive due process claim[] in the context of zoning administrative action, a plaintiff must show that the state administrative agency has been guilty of 'arbitrary and capricious action' in the strict sense, meaning that there is no rational basis for the administrative decision." *Systematic Recycling LLC v. City of Detroit*, 635 F. App'x 175, 182 (6th Cir. 2015) (quoting *Brody v. City of Mason*, 250 F.3d 432, 438 (6th Cir. 2001). "The administrative action will withstand substantive due process attack unless it is not supportable on any rational basis or is willful and unreasoning action, without consideration and in disregard of the facts or circumstances of the case." *Pearson v. City of Grand Blanc*, 961 F.2d 1211, 1221 (6th Cir. 1992) (citation modified).

The plaintiffs maintain that Doyle's delay in approving the permits was arbitrary and capricious because it was contrary to the City's zoning policy, and it was obvious that the CRA permitted marijuana grower and processer businesses on the site. They also dispute that they must

- 23 -

demonstrate that Doyle's actions "shock the conscience."  But in *Golf Village North, LLC v. City of Powell*, the Sixth Circuit held that in the zoning context, a plaintiff must demonstrate a level of arbitrariness "so extreme that it 'shocks the conscience'" in order to state a substantive due process claim.  42 F.4th 593, 601 (6th Cir. 2022) (quoting *Range v. Douglas*, 763 F.3d 573, 588 (6th Cir. 2014)).  The court of appeals observed that "there are very few zoning cases that meet this mark." *Ibid.*  As guideposts, it pointed to two cases where substantive due process claims had been allowed to proceed: where "the government prosecuted a plaintiff for not having a land permit even though the prosecutor knew a permit had run with the land," *ibid.* (citing *Paterek*, 801 F.3d at 648-49), and "an ordinance requiring homeowners to mow large swaths of land entirely unrelated to their residences," *id.* at 601-02 (citing *Shoemaker v. City of Howell*, 795 F.3d 553, 567 (6th Cir. 2015)).

Rubicon's evidence fails to meet this standard.  Viewing the facts in Rubicon's favor, the plaintiffs have not presented a cognizable substantive due process claim based on conscience-shocking conduct.  It asserts that Doyle and the City "deliberately def[ied]" the terms of the rezoning agreement and points to the fact that it had to resort to state court litigation to compel the issuance of permits.  ECF No. 63, PageID.1140.  But there is no evidence that Doyle's rationale for refusing to grant the permits was motivated by ill will or was arbitrary in the constitutional sense.  At most, the plaintiffs' proofs show that Doyle erred in determining whether marijuana cultivation and processing businesses were entitled to operate on the Glenwood parcel based on his reading of the CRA and relevant ordinances.  And that reading was not unreasonable; the city ordinances allowed the applicants' proposed business uses only in Overlay Districts or in other areas properly zoned after the Planning Commission issued a Special Exception Permit.  Pontiac, Mich., Code §§ 3.1101-3.1102, 3.1105, 26-1498(c).  True, the state court later determined that his interpretation was incorrect, but the Sixth Circuit has held that there is no authority suggesting that

a "simple misinterpretation and misapplication of a municipal ordinance" rises to the level of a substantive due process violation. *Johnson v. City of Saginaw*, 980 F.3d 497, 514 (6th Cir. 2020). If it were otherwise, "zoning administrators would be on the hook for every wrong interpretation they make." *Golf Vill. N., LLC*, 42 F.4th at 602.

Contrary to displaying hostility to the plaintiffs' tenants' proposed uses, the evidence suggests that Doyle presented to the City Council his view of action it should take so that he could approve Pharmaco's and Family Rootz's proposals.  ECF No. 63-5, PageID.1185.  That suggests a *lack* of ill will, hardly conscience shocking.  It is not apparent from the record whether the City took any action on his suggestion, but the plaintiffs filed their action for mandamus and declaratory relief in Oakland County Circuit Court shortly thereafter, which ultimately resulted in the issuance of permits in May and June of 2021.  At most, the evidence suggests that the permits were held up for a few months.  Considering that deficiencies were identified in Pharmaco's and Family Rootz's applications as late as January 2021, it is not clear that they would have been entitled to permits immediately in any event.  Even crediting Rubicon's assertion that the delay caused the project's demise, it simply has not pointed to facts suggesting that the delay itself was conscience shocking or that Doyle's opinion about his authority to issue permits to its tenants was clearly unjustified.

The defendants are entitled to summary judgment on Count II of the complaint.

3.

Rubicon also alleges that the City's actions amounted to a regulatory taking of its property for which it is entitled to just compensation.

The Fifth Amendment forbids the government from taking private property for public use without just compensation contrary to the Fifth Amendment, which applies to the states.  *See* U.S. Const. amdt. V.; *Chicago, B. & Q.R. Co. v. Chicago*, 166 U.S. 226 (1897) (applying takings clause

to the states).  In some circumstances, the government's regulation of private property may "be so onerous" that it requires compensation under the Fifth Amendment.  *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 537 (2005); *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 148 (2021).  The test for whether a so-called "regulatory taking" has occurred requires the Court to assess whether a claimant "has established a cognizable property interest for the purposes of the Just Compensation Clause."  *Puckett v. Lexington-Fayette Urb. Cnty. Gov't*, 833 F.3d 590, 609 (6th Cir. 2016) (citation omitted).  Then the court evaluates the factors set out by the Supreme Court in *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104 (1978), which include "the economic impact of the regulation," its interference with reasonable investment-backed expectations, and the character of the government action.  *Penn Cent.*, 438 U.S. at 124.

Rubicon has not presented evidence supporting a compensable taking claim.  It does not dispute that its tenants ultimately received approval to operate.  Instead, it focuses its claim on the *delay* encountered by its tenants receiving their approval, first caused by Doyle's alleged misinterpretation of the City's ordinances and then by Doyle's delay in issuing the permits after the state court ordered him to do so.

It is true that a delay to recognizing a rightful entitlement can be compensable.  *See Bass Enters. Prod. Co. v. United States*, 381 F.3d 1360, 1366 (Fed. Cir. 2004) (citing *Tabb Lakes, Ltd. v. United States*, 10 F.3d 796, 803 (Fed. Cir. 1993)).  But delays come in degrees.  "[T]he extreme categorical rule that any deprivation of all economic use, no matter how brief, constitutes a compensable taking surely cannot be sustained."  *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*, 535 U.S. 302, 334 (2002); *see also Agins v. City of Tiburon*, 447 U.S. 255, 263 n.9 (1980).  If it were otherwise, "every delay in the use of property would render routine government processes prohibitively expensive or encourage hasty decisionmaking."  *Tahoe-Sierra Pres.*

- 26 -

*Council*, 535 U.S. at 335.  In the zoning context, the Supreme Court has distinguished between situations amounting to "extraordinary delay" and "normal delays in obtaining building permits, changes in zoning ordinances, variances, and the like." *First English Evangelical Lutheran Church of Glendale v. Los Angeles Cnty.*, 482 U.S. 304, 321 (1987).   Narrowing further to the situation presented here, in circumstances where a state or local body denies a permit that a reviewing court later determines should have been issued, courts "'generally have rejected' the claim that the delay amounted to a 'compensable [ ] regulatory taking' under the Fifth Amendment." *Richmond Rd. Partners, LLC v. City of Warrensville Heights*, No. 24-3502, 2025 WL 737342, at *3 (6th Cir. Mar. 7, 2025) (quoting Edward H. Ziegler, Jr., First English *and normal delays—Illegal permit denial and temporary takings*, 1 Rathkopf's The Law of Zoning and Planning § 6:28 (4th ed.)).  The ultimate question whether the delay here is more "extraordinary" or "ordinary" is answered by considering the length of the delay, "the nature of the permitting process," the reasons offered by the government, and whether the government acted in bad faith. *Wyatt v. United States*, 271 F.3d 1090, 1098 (Fed. Cir. 2001).

Any delay here is not so "extraordinary" as to require compensation.  The date the alleged taking began is somewhat uncertain, and Rubicon does not cite a specific date it believes the taking occurred.  Its theory appears to be that it was deprived of its property when Doyle determined that he could not grant any marijuana grower or cultivation license on the Glenwood property.  It does not cite any evidence regarding the date Doyle first came to this determination, and the record suggests that this belief was not the entire basis for any delays, since Pharmaco's and Family Rootz's applications were marked as deficient for reasons other than the zoning issue.  *E.g.*, Deficiency Notices, ECF Nos. 57-16; 57-26.  For the reasons discussed previously, Rubicon's tenants were not entitled to the permits before February 3, 2021, pending the Special Exception

from the Planning Commission.  The tenants received their permits in late May and early June, so the delay lasted approximately four months.  That delay is insufficient to maintain a taking claim.  Although the delay's length is not the sole dispositive factor, courts have denied claims based on delays that were far longer.  *See Wyatt*, 271 F.3d at 1098 (collecting cases where delays ranging from sixteen months to eight years were held not to be extraordinary); *Richmond Rd. Partners*, 2025 WL 737342, at *4 (holding that one-year delay between permit denial and court order requiring issuance was not extraordinary).  Even under the best-case scenario for Rubicon, which would consider the roughly year-and-a-half gap between the date of the CRA and the date Pharmaco and Family Rootz received their licenses, there was no extraordinary delay.  The licensing process for marijuana businesses in the City of Pontiac appears relatively complex, Doyle offered cogent reasons for his views about whether he could issue the permits, and there is no suggestion that the City acted in bad faith.  *Cf. Res. Invs., Inc. v. United States*, 85 Fed. Cl. 447 510 (2009) (stating that "[a] year or two of delay, without bad faith, is exceedingly unlikely to be extraordinary").

Rubicon seems to suggest that Doyle dithered in issuing permits after the state court's order directing their issuance, but the record does not support that theory either.  He issued Family Rootz's permits five days after the court order and Pharmaco's a few days later.  ECF Nos. 57-37; 57-38; 57-39; 57-40.  Rubicon has not pointed to any cases suggesting that delays of such duration are extraordinary.  Because Rubicon cannot establish that its tenants experienced an extraordinary delay in receiving their permits, it cannot maintain a taking claim.

## C.

The other self-contained lawsuit included in the complaint pits Joseph Brown and his company, Browne Design Consulting LLC — the "Brown plaintiffs" — against the City with a

retaliation claim based on the protected conduct of suing the City to compel issuance of the business permits and licenses. The retaliatory act consisted of Pontiac Mayor Tim Greimel allegedly telling another developer — SK Properties — that it needed to cancel its contract with Browne Design to obtain City approval for its project.

To prevail on a First Amendment retaliation claim, the plaintiffs must offer evidence that (1) they were engaged in protected conduct; (2) an adverse action was taken against them that would deter a person of ordinary firmness from continuing to engage in that conduct; and "(3) there is a causal connection between elements one and two — that is, the adverse action was motivated at least in part by the plaintiff's protected conduct." *Thaddeus–X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (*en banc*); *see also Evans–Marshall v. Board of Educ. of Tipp City Exempted Vill. Sch. Dist.*, 624 F.3d 332, 337 (6th Cir. 2010).

The parties do agree on some key points. The City, as it must, does not contest that filing a lawsuit is protected First Amendment activity. *See Eckerman v. Tenn. Dep't of Safety*, 636 F.3d 202, 208 (6th Cir. 2010) ("The filing of a lawsuit to redress grievances is clearly protected activity under the First Amendment."). It also does not appear to contest that conditioning SK Properties' zoning approval on it terminating its relationship with Browne Design would constitute an adverse action against the Brown plaintiffs. *Powers v. Hamilton Cnty. Pub. Def. Comm'n*, 501 F.3d 592, 609 (6th Cir. 2007) ("Even if an intervening third party is the immediate trigger for the plaintiff's injury, the defendant may still be proximately liable, provided that the third party's actions were foreseeable.").

The City argues, however, that the Brown plaintiffs did not engage in the protected conduct because they did not file the state court lawsuit. The plaintiffs acknowledge that they were not parties to the state court lawsuit, but they contend that courts have recognized that third-party

victims of retaliation can maintain claims based on another party's protected speech. *See Thompson v. North American Stainless, LP*, 562 U.S. 170 (2011).

The Brown plaintiffs have the better argument on this point. Brown was a managing member of Rubicon, in addition to his role as principal of Browne Design. Decl. of Joseph Brown, ECF No. 63-3, PageID.1176. Rubicon brought suit under his leadership. It is no great stretch to infer that he exercised his First Amendment rights directly by causing Rubicon to file its lawsuit. If the City attempted to injure him by retaliating against his property (Browne Design), it is easy to conclude that he has a direct claim, and that Browne Design has a third-party claim under established jurisprudence. Consider *Thompson*, where the Supreme Court recognized that a plaintiff who was fired after his employer was notified that his fiancée had filed an EEOC charge could maintain a claim under Title VII for unlawful retaliation because he was within the zone of interests the statute sought to protect. *Thompson*, 562 U.S. at 174, 178. That rationale has been recognized in the First Amendment retaliation context. *See*, *e.g.*, *Fakhoury v. O'Reilly*, 837 F. App'x 333, 340-41 (6th Cir. 2020); *Nailon v. Univ. of Cincinnati*, 715 F. App'x 509, 516 (6th Cir. 2017); *Henley v. Tullahoma City Sch. Sys.*, 84 F. App'x 534, 540-42 (6th Cir. 2003); *see also Benison v. Ross*, 765 F.3d 649, 661 (6th Cir. 2014) ("The Benisons have provided evidence to support the reasonable inference that the Defendants decided to file a lawsuit against Kathleen to recover sabbatical pay because of her husband's involvement in the no-confidence resolution.").

The scope of relationships for which third-party retaliation is unconstitutional is somewhat hazy, and in the Title VII context where the theory originated, the Supreme Court recognized that there may be "difficult line-drawing problems concerning the types of relationships entitled to protection." *Thompson*, 562 U.S. at 174. This uncertainty is relevant here, where the relationship between plaintiff Browne Design and Rubicon, the entity that engaged in the protected conduct, is

not "familial" in the human sense of the term, despite their common parentage.  Nevertheless, the Supreme Court has declined "to identify a fixed class of relationships for which third-party reprisals are unlawful," but counseled that the firing of a close family member probably always is sufficient while inflicting milder hardship on a "mere acquaintance" likely will not be enough. *Id.* at 175.  Neither the Supreme Court nor the Sixth Circuit have restricted the theory to human family relationships and have emphasized that the inquiry ultimately is contextual. *Id.* at 175 (stating that "the significance of any given act of retaliation will often depend upon the particular circumstances.").  The policy motivations justifying the extension of First Amendment interests to related parties seem also to encompass corporate relatives. *Cf. Behne v. Halstead*, No. 13-0056, 2014 WL 1689950, at *18 (M.D. Pa. Apr. 29, 2014) ("[T]he First Amendment would be severely undermined if its protective ambit would not also encompass an employee who was retaliated against for his expressive association with a person who engaged in protected speech.").  In any event, any concern is mitigated by the City's failure to present any argument that corporate relationships are categorically exempt from constitutional protection under a First Amendment retaliation claim.  Browne Design maintains a sufficiently close legal relationship with Rubicon, by virtue of Brown's leadership of both entities, to maintain a First Amendment retaliation claim.

But the Brown plaintiffs face other problems with this claim, based on the lack of supporting record evidence.  The City correctly observes that there is no admissible evidence that any City official took an adverse action or that the Brown plaintiffs had a contract that was cancelled.  There is a document in the record from Brown asserting that SK Properties' manager, Tzvi Koslowe, told him that the mayor informed him that he needed to cancel its contract with Browne Design because Rubicon had sued the City.  Brown decl., ECF No. 63-3, PageID.1177. The City contends that Brown's declaration should not be considered because it does not contain

a date, is replete with hearsay statements, particularly as to his conversations with SK Properties'
managers, and is not based on personal knowledge — presumably because he was not present at
the meeting between City officials and SK Properties leaders.  The last two points, although
relevant, could be overcome by the statement of Vern Gustafsson, the City's former planning
manager, who wrote that he attended the meeting where Mayor Greimel reportedly said that "if
SK Properties wanted to obtain approval of its Shores at Crystal Lake project, then he needed to
terminate the relationship between SK Properties and Browne Design Consultants, LLC."
Gustafsson decl., ECF No. 63-11, PageID.1222-23.  But the statements by both Brown and
Gustafsson suffer from fatal defects that disqualify them from evidentiary consideration.

Neither of these two statements were made under oath.  Nor do they comport with the
statutory requirements for unsworn declarations.  Section 1746 of Title 28 prescribes the manner
of providing evidence in an unsworn declaration.  There are four requirements: "unsworn
declarations can be used as evidence 'only if' they are 'subscribed as true,' sworn under penalty
of perjury, dated, and signed."  *In re FirstEnergy Corp. Sec. Litig.*, No. 20-03785, 2024 WL
1984802, at *4 (S.D. Ohio May 6, 2024).  The Sixth Circuit has held that undated affidavits or
declarations should not be considered as evidence.  *See Bonds v. Cox*, 20 F.3d 697, 702 (6th Cir.
1994).  There is an exception to this rule where extrinsic evidence "demonstrate[s] the period when
the document was signed."  *Peters v. Lincoln Elec. Co.*, 285 F.3d 456, 475 (6th Cir. 2002).
However, in *Peters*, the defendant proffered an additional affidavit with further context.  *Id.* at
476.  There is no record evidence here that would place Gustafsson's affidavit in a narrower time
frame than after the events recited therein (2022) and the date the plaintiffs filed their response to
the motion for summary judgment (December 20, 2024).  Neither of these documents amount to
competent proof that may be considered when deciding a motion for summary judgment.  *See* Fed.

- 32 -

R. Civ. P. 56(c)(1)(A); *Bonds*, 20 F.3d at 702 (holding that when deciding a motion for summary judgment, "unsworn affidavits . . . [that] were technically deficient . . . should not be considered . . . . Unsworn declarations are permitted to be used as evidence only if 'subscribed . . . as true under penalty of perjury, *and dated* [.]'") (citing 28 U.S.C. § 1746). Absent the statements of Brown and Gustafsson, the only evidence in the record regarding the alleged retaliation is Mayor Greimel's own declaration that he did not retaliate but instead merely suggested to Koslowe that Brown was not an effective spokesperson for its development project at public town hall meetings. Tim Greimel decl., ECF No. 67-6, PageID.1291. That is not sufficient to establish adverse action.

Even if the statements of Brown and Gustafsson are considered, however, the Brown plaintiffs' claim still suffers from another flaw: the plaintiffs did not plead a claim against Mayor Greimel. And in order to hold the City liable for his actions, they must demonstrate that (1) they suffered a constitutional violation and (2) either a custom of toleration for illegal practices or the ratification of a violation by an official with final decision-making authority directly caused their deprivation. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691, 694 (1978) (holding that "a municipality cannot be held liable under § 1983 on a *respondeat superior* theory"); *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986) (holding that a plaintiff can demonstrate an official policy by pointing to a decision of an official with final decisionmaking authority over the matter at issue).

When a plaintiff proceeds on a single-act theory of liability against a municipality, it must point to a "deliberate choice to follow a course of action . . . from among various alternatives by the official . . . responsible for establishing final policy with respect to the subject matter in question." *Pembaur*, 475 U.S. at 483. Under *Monell*, the Court must determine as a matter of law the identities of final policymakers capable of binding a municipality. *See Jett v. Dallas Indep.*

*Sch. Dist.*, 491 U.S. 701, 737 (1989) ("As with other questions of state law relevant to the application of federal law, the identification of those officials whose decisions represent the official policy of the local governmental unit is itself a legal question to be resolved by the trial judge before the case is submitted to the jury."); *see also Baar v. Jefferson Cty. Bd. of Educ.*, 476 F. App'x 621, 638 (6th Cir. 2012) ("[T]he actions of a single official can only create liability for the local government where that official has final policymaking authority, and whether an official has such final authority is a question of state law."). The "[m]ere authority to exercise discretion while performing particular functions does not make a municipal [official] a final policymaker unless the official's decisions are final and unreviewable and are not constrained by the official policies of superior officials." *Feliciano v. City of Cleveland*, 988 F.2d 649, 655 (6th Cir. 1993).

In their response brief, the plaintiffs insist that Mayor Greimel's statement amounted to a policy that the City would not approve SK Properties' development unless it canceled its contract with Browne Design, apparently abandoning their representation in discovery responses that councilwoman Rutherford made the statement. The City responds that Mayor Greimel is not a final decisionmaker with respect to zoning issues. The City has the stronger position.

According to the Pontiac's Zoning Code, the responsibility for approving or rejecting re-zoning requests, such as SK Properties', ultimately lies with the City Council. *See* Pontiac, Mich. Code § 6.802. Although a mayor may veto the Council's action, the Council ultimately retains authority to override the veto. *See* City of Pontiac Charter (adopted 1982), § 3.112. In analogous circumstances, courts have found such override authority means that a mayor's decisions reviewable and therefore not final. *See Advanced Tech. Bldg. Sols., L.L.C. v. City of Jackson*, 817 F.3d 163, 165-67 (5th Cir. 2016); *Rasche v. Vill. of Beecher*, 336 F.3d 588, 601 (7th Cir. 2003) (holding that a village president lacked final policymaking authority with regard to zoning since

under state law the Board of Trustees was given authority to enact policy, the president only had tie-breaking authority, and the president's veto power could be overridden); *Manor Healthcare Corp. v. Lomelo*, 929 F.2d 633, 637-38 (11th Cir. 1991) (holding that a mayor was not final decision maker with respect to allegations that he allegedly extorted a developer because the city council had the authority to override the mayor on zoning issues). Because Mayor Greimel is not a final-decision maker with respect to zoning issues and the plaintiff has not described any other viable *Monell* theory, the City cannot be held liable for his alleged statement.

The City is entitled to summary judgment on this claim.

III.

Plaintiff Rubicon brought a development project to the City of Pontiac that very well would have benefitted the City and its residents, particularly through new employment opportunities and access to a new grocery store. It is unfortunate that it never took root, stifled by bureaucracy and shortsightedness. But the evidence does not establish triable issues that render the project's demise the result of constitutional violations for which either of the defendants are liable.

Accordingly, it is **ORDERED** that the defendants' motion for summary judgment (ECF No. 57) is **GRANTED**.

It is further **ORDERED** that the complaint is **DISMISSED WITH PREJUDICE**.

s/David M. Lawson<br>DAVID M. LAWSON<br>United States District Judge

Dated:  July 2, 2025

- 35 -